## PENNSYLVANIA R. CO. et al. v. UNITED STATES (INTERSTATE COMMERCE COMMISSION et al., Interveners).

Civil Action No. 2092.

District Court, D. New Jersey.

Oct. 9, 1943.

On Argument in Respect to Form of Decree

Dec. 8, 1943.

John A. Hartpence, of Trenton, N. J., for Pennsylvania R. Co.

Duane E. Minard, of Newark, N. J., and Parker McCollester, of New York City, for Hoboken Manufacturers R. Co. and Seatrain Lines, Inc.

Arthur T. Vanderbilt, of Newark, N. J., and H. H. Larimore, of St. Louis, Mo., for New Orleans & Lower Coast R. Co.

E. M. Reidy, Asst. Chief Counsel, Interstate Commerce Commission, of Washington, D. C., for Interstate Commerce Commission.

Robert L. Pierce, Sp. Asst. to Atty. Gen., for the United States.

Before BIGGS, Circuit Judge, and FAKE and SMITH, District Judges.

476

BIGGS, Circuit Judge.

The suit at bar was brought under the provisions of Acts of Congress approved June 18, 1910, 36 Stat. 539, March 3, 1911, 36 Stat. 1148 and October 22, 1913, 38 Stat. 219, 28 U.S.C.A. §§ 41(28) and 43 to 48 inclusive, by some fifteen trunk line rail carriers to set aside an order of the Interstate Commerce Commission entered by the Commission in its proceedings at Nos. 25728 and 27878 on October 13, 1941. Though the amended petition complains of two other orders, they are supplementary to or in aid of the order of October 13, 1941, and therefore it is the order of October 13, 1941, with which we are really concerned. Since the case at bar requires extensive findings of fact we shall endeavor to reduce this opinion to essentials in an endeavor to make a complicated factual situation plain. The findings of fact filed with this opinion will state the facts more fully.

The order of October 13, 1941,[1] requires some fifty-two rail carriers, accordingly as they participate in through-rail and water routes with Seatrain Lines, Inc., in interstate commerce between Belle Chasse (New Orleans), Louisiana, and Hoboken, New Jersey, to cease and desist from prohibiting the interchange of their freight cars with Seatrain. The order also requires the rail carriers to establish reasonable rules for freight car interchange with Seatrain at a per diem rate of $1.00 per day per car but provides also that the per diem is to be paid by Seatrain only for such periods of time as the cars are in its actual possession. The Interstate Commerce Commission, Seatrain, New Orleans & Lower Coast Railroad Company, hereinafter referred to as Lower Coast, and Hoboken Manufacturers Railroad Company, hereinafter referred to as Hoboken Railroad, have intervened in this proceeding as parties defendant.

Seatrain is a common carrier by water subject to the Commission's jurisdiction. Investigation of Seatrain Lines, Inc., 195 I.C.C. 215. A description of the manner in which Seatrain operates is set out fully in an opinion of this court reported in Hoboken Mfrs' R. Co. v. United States, D.C., 47 F.Supp. 779, at page 781. Seatrain operates ocean-going vessels having four decks, each deck in turn having four

---

[1] As follows:

Order

No. 25728

Hoboken Manufacturers Railroad Company

v.

Abilene & Southern Railway Company et al.

No. 25878

New Orleans and Lower Coast Railroad Company

v.

The Akron, Canton & Youngstown Railway Company et al.

These proceedings being at issue upon complaints and answers on file, and having been duly heard and submitted by the parties, and full investigation of the matters and things involved having been made, and the Commission having, on the date hereof, made and filed a report on further hearing, containing its findings of fact and conclusions thereon, which said report together with the prior reports, Investigation of Seatrain Lines, Inc., 206 I.C.C. 328 and Increases in North Dakota Freight Rates and Charges, 237 I.C.C. 291, 297, are hereby referred to and made a part hereof:

It is ordered, That the defendants listed in the appendix to said report on further hearing, according as they participate in through routes with complainants and Seatrain Lines, Inc., in interstate commerce via Belle Chasse, La., and Hoboken, N. J., be, and they are hereby, notified and required to cease and desist on or before February 2, 1942, and thereafter to abstain from observing and enforcing their present rules, regulations, and practices which prohibit the interchange of their freight cars with complainants herein for transportation by Seatrain Lines, Inc., in interstate commerce.

It is further ordered, That said defendants, according as they participate in the through routes referred to in the next preceding paragraph, be, and they are hereby, notified and required to establish, on or before February 2, 1942, and thereafter to observe and enforce rules, regulations, and practices with respect to the interchange of freight cars with complainants for transportation by Seatrain Lines, Inc., in interstate commerce corresponding with the current code of per diem rules governing the interchange of freight cars between said defendants and other rail carriers, including the current rate of $1 per car per day; provided, however, that such per diem shall be payable by Seatrain Lines, Inc., only for such period as the cars are in its actual possession.

And it is further ordered, That this order shall continue in effect until the further order of the Commission.

sets of standard gauge railroad tracks. By means of a special loading device, consisting of a crane and cradle, provided at three ports (Hoboken, New Jersey, Belle Chasse, Louisiana, and Havana, Cuba), loaded freight cars with their contents are put on board Seatrain ships without breaking bulk and are thus transported in commerce. Seatrain's transportation usually takes the cars and their contents into the port of Havana, Cuba, en route to or from Hoboken or Belle Chasse. The loading facilities for Seatrain ships are located at Belle Chasse on the property of Lower Coast, a terminal-switching railroad, a subsidiary of the Missouri-Pacific Railroad Company, conecting in turn with the Southern Pacific and the Texas Pacific Railroad Company. The loading facilities at Hoboken are located on the property of Hoboken Railroad. Hoboken Railroad is a short, single-track terminal-switching line which runs along the water front of Hoboken and connects with the Erie Railroad and via the Erie with other trunk lines reaching New York harbor.

From 1929 to 1932 Seatrain and its predecessor company operated its ships between Belle Chasse and Havana exclusively. During this period most of the petitioners in the case at bar allowed their cars to be delivered freely to Seatrain ships to be delivered to Cuban railroads. In 1931 Seatrain contemplated the extension of its operations into interstate commerce by the use of the Port of New York and in 1932 made arrangements to effect that end with Hoboken Railroad. These arrangements are described at length in our prior opinion. See 47 F.Supp. at page 783. Just prior to the inauguration of Seatrain's interstate service, the American Railway Association (to which trunk line railroads including the petitioners belong) promulgated a car service rule which was intended to eliminate Seatrain as a competitor. The rule (Rule 4) provides, "Cars of railway ownership must not be delivered to a steamship, ferry or barge line for water transportation without permission of the owner filed with the Car Service Division."

The promulgation of this rule by the American Railway Association and the refusal of many of the petitioners to permit the delivery of their cars to Seatrain brought an immediate reaction. Hoboken Railroad and the Lower Coast filed two separate complaints with the Commission and attacked the refusal of the railroads to allow their freight cars to be used by Seatrain. Seatrain was permitted to intervene in both proceedings. The two complaints were subsequently consolidated and the consolidated cause has been before the Commission for hearings and argument on at least three different occasions. In 1935 the Commission held in its report in Investigation of Seatrain Lines, Incorporated, at No. 25,565,[2] 206 I.C.C. 328, that Seatrain was a common carrier by water and subject to the jurisdiction of the Commission; that the service of Seatrain between Hoboken and New Orleans was in the public interest and (most important of all in so far as the legal questions presented in this case are concerned) that where through routes existed between rail carriers and water carriers the Commission had jurisdiction to require rail carriers who were parties to such through routes to interchange cars with water carriers if such was the reasonable and appropriate method of interchanging traffic moving over such through routes. The Commission stated: "We find nothing in the act imposing any duty upon or giving us jurisdiction to require a rail carrier to permit delivery of its cars to a water carrier where through routes between such rail and water carriers do not exist." The Commission also went on to say: "Whether defendants [including some of the petitioners in the case at bar] who refuse to permit delivery of their cars to Seatrain participate in through routes with Seatrain cannot be determined upon this record."

Thereafter on January 28, 1938, in a proceeding at No. 25,727, known as the "Seatrain Through-Route Case", Seatrain Lines, Incorporated, v. Akron, Canton & Youngstown Railway Co., 226 I.C.C. 7, the Commission found that through routes ex-

---

[2] The report also embraced No. 25,546, Application of Missouri-Pacific Railroad Company and Texas & Pacific Railway Company under Section 5(19–21) of the Interstate Commerce Act in the Matter of Installation of Common-Carrier Service by Water Other Than Through Panama Canal, No. 25,728, Hoboken Manufacturers Railroad Company v. Abilene & Southern Railway Company, and No. 25,878, New Orleans & Lower Coast Railway Company v. Akron, Canton & Youngstown Railway Company.

isted between certain rail carriers (including some of the petitioners) in connection with Seatrain "between points in trunk-line and New England territories, on the one hand, and southwestern territory on the other hand"; "That the public interest requires the establishment and maintenance of through routes and joint rates" by certain trunk-line rail carriers (including the petitioners) in connection with Seatrain between designated points in official territory, and southwestern territory; and that these connections were in the public interest. The Commission then proceeded to prescribe maximum joint rates. These joint rates were modified following a further hearing of the same proceeding in 1940 (243 I.C.C. 199) so as to not to exceed the joint rates over comparable routes between rail carriers and break-bulk water lines. The latter of course do not use railroad cars on their ships. It is important to have in mind that The Pennsylvania Railroad and certain of the other petitioners thereupon established the through routes prescribed by the Commission and, as the amended petition alleges, those through routes are now in full force and effect.

The Commission reopened for further hearing the proceedings at Nos. 25,728 and 25,878, Hoboken Manufacturers Railroad Company v. Abilene & Southern Railway Company, and New Orleans & Lower Coast Railroad Company v. The Akron, Canton & Youngstown Railroad Company, to determine on what terms and conditions, including compensation, the petitioners should be required to interchange their freight cars with Seatrain. On October 13, 1941, after completing its hearings the Commission announced its final decision (248 I.C.C. 109) and entered the cease-and-desist order of October 13, 1941, complained of in this proceeding. The Commission reaffirmed its jurisdiction to require rail carriers, parties to through routes with Seatrain, to permit the use of their freight cars in Seatrain's service.[3]

The Commission found that the rail carriers' refusal to permit interchange of cars between themselves and Seatrain was a violation of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., and that the current code of per diem rates governing the interchange of freight cars between the various railroads, including the current inter-railroad rate of $1 per day, should be payable by Seatrain, though only for such periods as the railcarriers' cars were in its actual possession.[4] On the same day the order complained of was entered by the Commission.[5]

The petitioners contend that the order of October 13, 1941, should be set aside or at least mitigated for three reasons. First, they assert that there is no duty on rail carriers to deliver their freight cars for the use of, or to interchange their cars with, a water carrier and that the Commission has no authority to direct such delivery or interchange. Second, they contend that the Commission is without power to require rail carriers to permit their cars to be taken and used on ocean-going vessels of a water carrier for transportation from place to place in the United States, such transportation going into a foreign port and through foreign waters. They assert last that the compensation fixed by the Commission for the use of the rail carriers' freight cars by Seatrain is confiscatory and that the orders of the Commission "exempting" Seatrain from paying for the use of railroad cars held for acceptance by it (as distinguished from cars actually in its possession) are unreasonable and arbitrary.

I

The parties have suggested to the court that this case may be moot because of circumstances brought on by war. This point was raised, we believe, merely for the purpose of fully informing the court as to present conditions governing Seatrain's service. Without going into details as to the nature of this service, it is sufficient to state that the order of the

---

[3] As we have already stated, in its interstate commerce Seatrain usually carried cars destined for Belle Chasse or Hoboken to Havana, Cuba. This is a fact which is conceded by all the parties.

[4] Seatrain has no cars of its own though it has indicated its willingness to buy freight cars. It already rents a substantial number of privately owned cars.

[5] The Commission ordered the proceeding at No. 25,565 to be discontinued, the proceedings at Nos. 25,728 and 25,878 to be dismissed without prejudice to the filing by Hoboken Railroad and Lower Coast of a petition for further consideration or for filing of new complaints after the proceeding at No. 25,727 had been disposed of, if the situation then warranted such action.

Commission is presently in effect and that that order requires the petitioners not only to abstain from enforcing present rules, regulations and practices which prohibit the interchange of their freight cars for transportation by Seatrain in interstate commerce, but also requires the petitioners to establish on or before a specified date, and thereafter to observe, rules and regulations with respect to the interchange of their freight cars for transportation by Seatrain in interstate commerce. We conclude that there is a justiciable controversy before this court within the purview of the Urgent Deficiencies Act, 38 Stat. 219, 28 U.S.C.A. § 41 (28) and §§ 43 to 48, inclusive. The Commission's order is a continuing one and embraces not only a negative duty upon the petitioners but requires affirmative conduct upon their part as well. Though the circumstances of Seatrain's service have been changed by the war, the case is not moot and the petitioners are entitled to a review of the order complained of. See Federal Trade Commission v. Goodyear Tire & Rubber Co., 304 U.S. 257, 58 S.Ct. 863, 82 L.Ed. 1326, and the cases cited therein.

## II

The petitioners contend that the history of the Interstate Commerce Act demonstrates that common carriers by rail have no duty to interchange cars with common carriers by water and the Commission has no power to direct interchange of cars between such carriers. If this be true the relief sought by the petitioners must be granted. To ascertain the correctness of this legal proposition a brief history of the Interstate Commerce Act and of some of the amendments to it is necessary.

Section 1 of the original Act of February 4, 1887, 24 Stat. 379, defined the term "railroad". We shall deal more specifically with other provisions of Section 1 at a later point, under heading III, of this opinion. Section 3 provided in part that: "Every common carrier subject to the provisions of this act shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivering of passengers and property to and from their several lines and those connecting therewith, and shall not discriminate in their rates and charges between such connecting lines; * * *." The provisions quoted have remained in

substance in the Act since 1887. Section 12 set forth the duties of the Commission which were largely those of an investigatory body.

The Hepburn Act of June 29, 1906, 34 Stat. 584, increased the powers of the Commission and made it to some extent a regulatory as well as an investigatory body. The Hepburn Act also enlarged the definition of a railroad to include water carriers when both are used for continuous carriage or shipment in interstate commerce. The term "railroad" was defined to include the facilities required for "transportation" and the term "transportation" was itself defined so as to include cars. Section 1 of the Hepburn Act provided that it should "be the duty of every carrier subject to the provisions of this Act * * * to establish through routes and just and reasonable rates applicable thereto". The Hepburn Act required connections between lateral or branch-line railroads and trunk line carriers and required cars to be furnished for the movement of through traffic. The Commission was not expressly given the power to compel carriers to exchange cars.

The Mann-Elkins Act of June 18, 1910, 36 Stat. 539, 545, again amended the Interstate Commerce Act. Section 7 of the Mann-Elkins Act broadened the definition of "transportation" as contained theretofore in Section 1 of the Interstate Commerce Act. The section also provided that the carriers subject to the Act should establish through routes with applicable rates and make reasonable rules and regulations with respect to the "exchange, interchange, and return of cars" used on such through routes.

The Interstate Commerce Act was amended further by the Esch Car Service Act of May 29, 1917, 40 Stat. 101. This statute employed the term "car service" which it defined as including the "exchange, interchange and return of cars" used by any carrier subject to the provisions of the Interstate Commerce Act. It required every carrier subject to the Interstate Commerce Act to establish reasonable rules and regulations for car service used in connection with through routes and specifically gave the Commission power to establish reasonable rules and practices in respect to car service if a carrier failed to do so. It also provided a penalty to be imposed if a carrier refused to comply with orders or directions of the

Commissioner as to car service. The Commission was empowered by general or special order to require all carriers to file rules and regulations in respect to car service and also was given power, "* * * after hearing, on a complaint or upon its own initiative without complaint [to] establish reasonable rules, regulations and practices with respect to car service, * * *".

The petitioners take the position that even the Esch Car Service Act did not expressly impose on carriers by railroad a duty to exchange cars and did not impose any duty on carriers by rail to exchange cars with carriers by water. They contend further that the Esch Car Service Act did not give the Commission authority to require such service of them. These contentions cannot be sustained for the contrary clearly appears from the express words of the Esch Car Service Act. After the passage and approval of the Esch Car Service Act the Commission had the power to compel the exchange, interchange and return of cars between carriers subject to the Act. Since rail carriers and water carriers were subject to the Act, the Commission had the power to compel the interchange of cars between a rail carrier and a water carrier such as Seatrain.

An important change was worked in the Interstate Commerce Act by the Transportation Act, 1920, 41 Stat. 456. Section 400(4) of Title IV of the Transportation Act, 1920, amended Section 1 of the Interstate Commerce Act, 49 U.S.C.A. § 1(4), and provided that every common carrier subject to the Interstate Commerce Act should establish through routes and reasonable rates applicable thereto, should provide reasonable facilities for operating through routes and should make reasonable rules and regulations with respect to the operation of such through routes. It will be noted that the express provision of the Mann-Elkins Act which required common carriers subject to the Interstate Commerce Act " * * * to make reasonable rules and regulations with respect to the exchange, interchange, and return of cars * * *" to be employed in connection with through routes, was omitted from the Transportation Act, 1920, in favor of the provisions of the next referred to.

Section 402 of the Transportation Act, 1920, 49 U.S.C.A. § 1(10, 11, 13, 14), amended the paragraphs added to Section 1 of the Interstate Commerce Act by the Esch Car Service Act to read, in part, as follows:

"(10) The term 'car service' in this Act shall include the use, control, supply, movement, distribution, exchange, interchange, and return of locomotives, cars * * * by any carrier by railroad subject to this Act.

"(11) It shall be the duty of every carrier by railroad subject to this Act to furnish safe and adequate car service and to establish, observe, and enforce just and reasonable rules, regulations, and practices with respect to car service; * * *."

"(13) The commission is hereby authorized by general or special orders to require all carriers by railroad subject to this Act, or any of them, to file with it from time to time their rules and regulations with respect to car service, and the Commission may, in its discretion, direct that such rules and regulations shall be incorporated in their schedules showing rates, fares, and charges for transportation, and be subject to any or all of the provisions of this Act relating thereto.

"(14) The commission may, after hearing, on a complaint or upon its own initiative without complaint, establish reasonable rules, regulations, and practices with respect to car service by carriers by railroad subject to this Act, including the compensation to be paid for the use of any locomotive, car, or other vehicle not owned by the carrier using it, and the penalties or other sanctions for nonobservance of such rules, regulations or practices."

The petitioners lay particular emphasis on the provisions of Section 1 (10) (11) (13) and (14) of the Interstate Commerce Act as amended by the Transportation Act, and point out that it became the duty of "every carrier by railroad" to furnish safe and adequate "car service". The petitioners argue that since the "car service" provisions of the Act as amended expressly imposed the duty to furnish car service on carriers by railroad and did not impose that duty on carriers by water (the Mann-Elkins Act having expressly imposed this duty on rail and water carriers alike), rail carriers were required, after the enactment of the Transportation Act, 1920, to interchange their cars only with rail carriers and not with

water carriers. In short, the petitioners contend that despite the fact that water carriers as well as rail carriers were then subject to the provisions of the Interstate Commerce Act and were required to establish through routes, the duty of car service was limited by the Transportation Act, 1920, to carriers by railroad who were required only to exchange cars with carriers by railroad. The petitioners assert that their argument is strengthened by the fact that while Section 402(13) of the Transportation Act expressly conferred on the Commission the power to compel a carrier by railroad to furnish its lines with adequate facilities for fulfilling the requirement of car service imposed by the Transportation Act, 1920, it gave no like power to the Commission to compel water carriers to supply such facilities and that therefore it was the intention of Congress not to compel the exchange of cars between carriers by rail and carriers by water.

The Transportation Act of 1940, 54 Stat. 898, recast the Interstate Commerce Act. Provisions respecting railroads were put in part I; those relating to motor carriers, in part II; and those affecting water carriers were placed in part III. Part III, commonly called the Water Carrier Act, 49 U.S.C.A. § 901 et seq. Section 2(c) of the Transportation Act of 1940, 49 U.S. C.A. § 1(4), amended Section 1(4) of the Interstate Commerce Act. Subsections 10, 11, and 13 of Section 1 of the Interstate Commerce Act remained unchanged by the amendments of the Transportation Act of 1940, 49 U.S.C.A. § 1(10) (11) and (13). Subsection (14) of Section 1 of the Interstate Commerce Act was altered. Section 1(14) (a) reads as follows: "The Commission may, after hearing, on a complaint or upon its own initiative without complaint, establish reasonable rules, regulations, and practices with respect to car service by common carriers by railroad subject to this part, including the compensation to be paid and other terms of any contract, agreement, or arrangement for the use of any locomotive, car, or other vehicle not owned by the carrier using it (and whether or not owned by another carrier), and the penalties or other sanctions for nonobservance of such rules, regulations, or practices."

The petitioners contend that the Transportation Act of 1940, and in particular those provisions just quoted, make it clear that they have no duty to interchange cars with a carrier by water and that the Commission possesses no power to compel them to do so; that the duty to interchange cars with carriers by water imposed on them by the Esch Car Service Act and allegedly obliterated by the amendment to the Interstate Commerce Act embodied in the Transportation Act, 1920, were not reimposed upon them. They concede that Section 1 (4), 49 U.S. C.A. § 1(4), requires the establishment of through routes by carriers by rail with carriers by water, but they go no further.

Putting aside the prior decisions of the Commission and of the courts [6] which are not helpful in view of the present form

6 We think that we need not discuss the decision of the Interstate Commerce Commission in Missouri & Illinois Coal Co. v. Illinois Central R. Co., 22 I.C.C. 39, decided in 1911 and cited with approval by the Supreme Court in 1931 in Chicago, R. I. & P. R. Co. v. United States, 284 U.S. 80, 91, 52 S.Ct. 87, 76 L.Ed. 177. The Interstate Commerce Commission in the cited case had before it Section 7 of the Mann-Elkins Act of June 18, 1910, 36 Stat. 539, 545, which specifically provided as we have stated that it was the duty of every common carrier subject to the provisions of the Act, not only to provide reasonable facilities for operating through routes but also " * * * to make reasonable rules and regulations in respect to the exchange, interchange, and return of cars used therein. * * *" We have not discussed such decisions as Colorado Coal Traffic Ass'n v. Colorado & S. Ry.

Co., 24 I.C.C. 618, or Omaha Grain Exchange v. Great Northern Ry. Co., 47 I.C.C. 532, decided respectively in 1912 and 1917, for similar reasons. These are cases in which the Commission reiterated its authority to require car interchange between carriers by railroad where they were parties to through routes. The provisions of Section 7 of the Mann-Elkins Act were applicable when the first case was decided and those of the Esch Car Service Act, 40 Stat. 101, were pertinent in the latter case. For substantially similar reasons we have omitted also any discussion of such cases as Flour City S. S. Co. v. Lehigh Valley R. Co., 24 I.C.C. 179, decided in 1912, and Chattanooga Packet Co. v. Illinois Central R. Co., 33 I.C.C. 384, decided in 1915.

We shall not deal with the provisions of the Panama Canal Act of August 24, 1912, 37 Stat. 568, in this phase of our

482

and substance of the Interstate Commerce Act and restricting ourselves to the words of the Interstate Commerce Act, we are unable to agree with the contentions of the petitioners for the reasons which follow.

■ Section 1(1) (a) of the Act, 49 U.S.C.A. § 1(1) (a), provides that the provisions of part I shall apply to common carriers engaged in the transportation of property "* * * partly by railroad and partly by water when both are used under * * * [an] arrangement for a continuous * * * shipment * * *". The word "both" as used is a term of art. It means that the provisions of part I except where expressly inapplicable by reason of specific terms in some of its sections, are made to apply to common carriers by water where they are engaged in transporting goods as part of a continuous shipment in cooperation with a carrier by railroad.

Section 1(3) (a), 49 U.S.C.A. § 1(3) (a), defines the term "common carrier" as including all persons "engaged in such transportation * * * as aforesaid as common carriers for hire". The transportation previously described is that set out in Section 1. Section 1(3) (a) defines transportation as including "* * * cars, and other vehicles * * *, and all instrumentalities and facilities of shipment * * *, irrespective of ownership * * *".

Section 1(4), 49 U.S.C.A. § 1(4), provides: "It shall be the duty of every common carrier subject to * * * [part I] to provide and furnish transportation upon reasonable request therefor, and to establish reasonable through routes with other such carriers, and just and reasonable rates, fares, charges, and classifications applicable thereto; and it shall be the duty of common carriers by railroad subject to this part to establish reasonable through routes with common carriers by water subject to part III, and just and reasonable rates, fares, charges, and classifications applicable thereto. It shall be

the duty of every such common carrier establishing through routes to provide reasonable facilities for operating such routes and to make reasonable rules and regulations with respect to their operation, and providing for reasonable compensation to those entitled thereto; and in case of joint rates, fares, or charges, to establish just, reasonable, and equitable divisions thereof, which shall not unduly prefer or prejudice any of such participating carriers."

The petitioners and Seatrain are subject to the provisions of part I of the Act since they perform transportation services of the kind described in Section 1(1) (a). Such carriers are required to furnish "transportation" which may include cars as specified by Section 1(3) (a) needed for the maintenance of through routes. Carriers by railroad are expressly required by Section 1(4) to establish through routes with carriers by water and the subsection provides also that "every such common carrier [by rail or by water engaged in continuous shipments] establishing through routes to provide * * * reasonable facilities for operating such routes * * *". Cf. Section 305(b), 49 U.S.C.A. § 905(b), relating to carriers by water under part III.

■ We think that it follows that rail carriers are required by the Interstate Commerce Act to supply cars which may go upon the lines of other carriers, including carriers by water, as may be necessary for the maintenance of through routes for continuous shipments at least insofar as the transportation takes place within the United States or its territorial waters. This is so because of the definition of "transportation" contained in Section 1(3) (a) and because of the further fact that cars indubitably are "facilities" of carriage as described in Section 1(4). Cf. General American Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. 422, 60 S.Ct. 325, 84 L.Ed. 361.[7] Such is the duty of common carriers by rail, but that is not to say that Congress has given the

decision because that portion of it remaining in the Interstate Commerce Act (Section 6(11), 49 U.S.C.A. § 6(11)) is more pertinent to the subject considered under the next heading of this opinion.

[7] It must be noted that the Supreme Court and Mr. Justice Roberts, the author of the opinion in the cited case, were construing the provisions of Section 15(13) of the Act, 49 U.S.C.A. § 15(13) which relates to the allowance to the owner of property transported who furnishes an instrumentality for the transportation. But referring to 49 U.S.C. Sec. 1(3), 49 U.S.C.A. § 1(3), Mr. Justice Roberts said, 308 U.S. at page 428, 60 S.Ct. at page 329, 84 L.Ed. 361. "Freight cars are facilities * * *, as defined by the Act."

Commission authority to compel reluctant carriers to fulfill this duty. To ascertain the authority of the Commission in this respect it is necessary to turn to the "car service" provisions of the Act. Subsection 10 of Section 1 defines the term "car service" as including the use, control, supply, movement and distribution of cars. Subsection (11) provides that it shall be the duty of "every carrier by railroad" subject to part I to furnish car service. The subsection is notably silent in that it does not state to what carriers (subject to part I) the rail carriers shall supply car service. As we have already indicated, common carriers by water are subject to the provisions of part I upon the existence of the specified conditions of continuous carriage and through routes. We think therefore that carriers by railroad are required to exchange cars with carriers by water where both carriers are engaged in the transportation of property under an arrangement for continuous shipment on through routes. Subsection (13) authorizes the Commission "by general or special orders to require all carriers by railroad" subject to part I to file rules and regulations with the Commission in respect to car service, and, in the Commission's discretion, to direct that these rules and regulations shall be incorporated in the rail carriers' schedules. Subsection 14(a) gives the Commission authority on a complaint or upon its own initiative without a complaint, to establish rules and regulations and practices in respect to car service.[8] We think that it is clear that in view of the provisions of subsections (13) and (14) (a) that the Commission possesses the power to require carriers by railroad to supply common carriers by water with cars when necessary to effect transportation by rail and water routes for continuous shipment over through routes in interstate commerce insofar as that transportation takes place within the United States or its territorial waters.

■ Broad construction is required. A "National Transportation Policy" was declared by the sections preceding Sections 1, 201 and 301 of the Interstate Commerce Act, 49 U.S.C.A. §§ 1, 301 and 901, added by the Transportation Act of 1940. Congress intended the Act to develop, coordinate and preserve "a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense". The National Transportation Policy as stated by Congress, requires all of the provisions of the Interstate Commerce Act to be "administered and enforced" with a view to carrying out this intention.

### III

The petitioners also take the position that the Commission is without power to require rail carriers to permit their cars to be taken and used on the ocean-going vessels of a carrier by water such as Seatrain, through foreign waters, the vessels of the carrier by water docking during the course of the voyage at a foreign port. The facts are not in dispute. Seatrain carries cars of the petitioners from Hoboken, New Jersey, to Belle Chasse, Louisiana, and from Belle Chasse to Hoboken, frequently operating by way of Havana, Cuba. Graham M. Brush, president of Seatrain, made the character and scope of Seatrain's operations very plain. His testimony is set out in the margin.[9] The Commission found, Seatrain Lines, Inc., v. Akron, C. & Y. Ry. Co., 226 I.C.C. 7, 13,

---

[8] See also subsections (15), (17) (a) and (21). These subsections are auxiliary to and in aid of subsections (10) to (14) inclusive.

[9] See p. 21 of the transcript in I.C.C. Docket No. 25,565, which was made part of the record in I.C.C. Docket No. 25,728 and No. 25,878 (I.C.C. Tr. 240-6; Exhibit 36.)

Mr. Brush testified in this connection as follows:

"Q. Your ships are now operating in what service or in what services, Mr. Brush? A. Our present operation is from New York to Havana, thence to New Orleans, returning from New Orleans to Havana to New York; the ships leaving New York and clearing for the foreign ports, entering Havana and again clearing from Havana for a foreign port.

"Q. What is the length of the voyage from New York to Havana? A. In time the voyage is three and a half days under the present operating schedule from New York to Havana, a distance of approximately 1200 nautical miles.

"Q. And from Havana to New Orleans? A. From Havana to New Orleans the running time is approximately two days, a distance of 600 nautical miles.

"Q. In those voyages do your ships go out to sea? A. Yes, sir. * * *"

14, that: "* * * the undisputed facts are that the ordinary route of Seatrain between Hoboken and Belle Chasse is via Havana; that over such route the vessels operate in part through foreign waters and touch a foreign port; that occasionally the call at Havana is omitted, in which instances the route is in part outside the territorial waters of the United States; that when the vessels call at Havana, cars containing interstate freight are placed under United States customs seals at the port of departure and remain so until arrival at the port of destination, and the freight contained in such cars is not made accessible to the Cuban authorities; that three sets of manifests are made out at the port of departure, one required by the Cuban authorities and another required by the United States customs relate to freight for Cuba, and the third, which shows only the cars moving in interstate commerce, is given the Cuban customs inspector as a matter of information; that no Cuban official has ever attempted to take jurisdiction over the interstate freight; and that there are no Cuban regulations affecting Seatrain's operations, but its vessels while at Havana are subject to all Cuban laws and regulations, such as those relating to quarantine and health, applicable to vessels of foreign register." It is conceded that Seatrain transports a very substantial number of empty cars, routing them preferably by Havana, in the hope that there they may pick up loads.

The Commission based its jurisdiction to require the petitioners to deliver their cars to Seatrain for transportation on its routes via Havana, on the provisions of what was formerly Section 6(13) (b) of the Interstate Commerce Act, 49 U.S.C.A. § 6(13), read in conjunction with former Section 5(19) [10] of the Act. The Commission held that the phrase used in Section 6(13) "through the Panama Canal or otherwise" was the equivalent of the phrase employed in Section 5(19), "through the Panama Canal or elsewhere". Section 5(14) prohibits the ownership or control by a railroad of a competing water carrier operating "through the Panama Canal or elsewhere". We think that the Commission's conclusion that the phrase of Section 6(13) has the same meaning as that quoted from Section 5 (19), is correct.[11] The Commission has repeatedly construed Section 5(19) as being applicable to carriers by water operating to or via foreign ports (see New Orleans and Havana Car Ferry Service, 188 I.C.C. 371) and did so in the Seatrain Through Route Case before the Transportation Act of 1940 was enacted.

The respondents assert that the provisions of old Section 6(13) (b) were in substance re-enacted and broadened by Section 15(3) and Section 307(d), 49 U.S.C.A. §§ 15(3) and 907(d), of the Interstate Commerce Act as constituted after the enactment of the Transportation Act of 1940. The respondents go a step further, however. They take the position that Sections 1(4) and 3(4) of the Interstate Commerce Act, 49 U.S.C.A. §§ 1(4) and 3(4) as constituted by the Transportation Act of 1940, gave carriers by water the benefit of the obligations imposed upon carriers by railroad. The Interstate Commerce Commission took a similar view in the rehearing at No. 25,728. See 248 I.C.C. 109.

Section 302(d), 49 U.S.C.A. § 902(d), defines a "common carrier by water" as "any person which holds itself out to the general public to engage in the transportation by water in interstate or foreign commerce of passengers or property * * *".

Section 302(i), 49 U.S.C.A. § 902 (i), defines "interstate or foreign transportation" or "transportation in interstate or foreign commerce" as used in part III as transportation of property "(2) partly by water and partly by railroad * * *, from a place in a State to a place in any other State; except that with respect to such transportation taking place partly in the United States and partly outside thereof, such terms shall include transportation by railroad * * * only insofar

---

[10] Paragraph (b) of subsection (13) of Section 6 was repealed by the Transportation Act of 1940. See 54 Stat. 910 and Section 6(11) of the present Act, 49 U.S.C.A. § 6(11). Subsection (11) was incorporated in the Transportation Act of 1940 and by it was made part of the present Interstate Commerce Act.

See Section 5(14), 49 U.S.C.A. § 5(14). These provisions were part of the Panama Canal Act of 1912. See Sections 6(13) (b) and 11 of the Act of August 24, 1912, c. 390, 37 Stat. 566.

[11] Compare Chicago, R. I. & P. R. v. United States, 274 U.S. 29, 47 S.Ct. 486, 71 L.Ed. 911.

as it takes place within the United States, and shall include transportation by water only insofar as it takes place from a place in the United States to another place in the United States; * * *." Do the words of subparagraph (j) (2) extend the jurisdiction of the Commission to transportation throughout its whole course from a place to a place within the United States despite the fact that that course of transportation transverses extraterritorial waters and goes into a foreign port? We conclude that this was the intention of Congress. We think therefore that the Commission has jurisdiction over transportation such as that carried on by the petitioners and Seatrain, from state to state in the United States, throughout the whole course of that transportation even if it passes through foreign waters and into foreign ports. But the fact that the Commission has jurisdiction of such transportation does not necessarily mean that the Commission can compel carriers by railroad to provide carriers by water with cars for routes passing through extraterritorial waters and into a foreign port.[12] What must be our conclusions as to this question?

As we have already stated, part III of the Interstate Commerce Act deals primarily with carriers by water. It expressly contemplates the establishment of through routes by common carriers by water with common carriers by railroad. See Section 305(b), 49 U.S.C.A. § 905(b), which repeats with one very pertinent exception, referred to hereinafter, the substance of Section 1(4), part I of the Act. Section 305(b) provides that common carriers by water are required "* * * to provide reasonable facilities for operating such through routes, * * *", i.e., to provide facilities for operating through routes with carriers by railroad. Section 302(*l*), 49 U.S.C.A. § 902(*l*), provides that the term "common carrier by railroad" means "a common carrier by railroad subject to the provisions of part I." In short, the "common carriers by railroad" referred to in Section 305(b), with which it is the duty of common carriers by water to establish through routes, are the common carriers by railroad defined in and subject to the provisions of part I. Section 1(1) of part I defines the transportation to which the

provisions of part I are applicable as the transportation of property partly by railroad and partly by water under arrangement for a continuous shipment "from any place in the United States through a foreign country to any other place in the United States * * *, but only in so far as such transportation * * * takes place within the United States". This limitation placed upon the nature of the transportation embraced by Section 1(1) does not limit the definition of transportation contained in Section 302(i) (2). This is obvious for the scope of the transportation defined in part III, Section 302(i) (2), is much broader than the concluding phrase of Section 1(1). But the common carriers by railroad subject to part III are those which, by express definition, are subject to the provisions of part I, and if cars are to be gotten from carriers by railroad for the use of carriers by water, it must be by virtue of the provisions of part I. Does it follow, therefore, that the car service provisions of the Act, subsections (10) to (14) of Section 1 of part I are applicable to compel common carriers by railroad to interchange cars with common carriers by water only for the transportation defined in Section 1(1); that is to say, for such transportation as takes place within the United States or its territorial waters? This is the gist of the question now before us.

We held under heading II that a common carrier by railroad has the duty to interchange cars with common carriers by water when necessary for the operation of an integrated transportation system as required by the National Transportation Policy declared by Congress. The transportation there dealt with was transportation within the United States or its territorial waters, viz., that described in Section 1(1) of part I of the Act. We are dealing now with the transportation carried on by Seatrain in conjunction with the petitioners under arrangements for continuous carriage or shipment from place to place in the United States but through extraterritorial waters and via the port of Havana. Conceding that the provisions of the Interstate Commerce Act are entitled to the broad interpretation which is necessary to effect the National Transporation Policy stated by Congress,

---

[12] Compare the decision of the Supreme Court in Chicago R. I. & P. R. Co. v. United States, 274 U.S. 29, 47 S. Ct. 486, 71 L.Ed. 911, which was based on old Section 6(13) (b).

should we reach the conclusion that the provisions of the Act compel carriers by railroad to furnish cars to carriers by water for such transportation?[13]

■ Are there other provisions of parts I or III of the Act that will compel the petitioners to furnish cars to Seatrain for Seatrain's extraterritorial transporation? The respondents point to the provisions of Section 305(b) and the words of that subsection which require common carriers by water to establish through routes with common carriers by railroad "and to provide reasonable facilities for operating such through routes * * *". But, assuming that cars are to be considered as facilities of transportation under this section, the duty is one which is imposed only upon carriers by water and not upon carriers by railroad. The sentence of Section 1(4), "It shall be the duty of every such common carrier [by railroad and water] to provide reasonable facilities for operating such [through] routes * * *" is absent from Section 305(b) and there is therefore no conjoint duty imposed by it on carriers by railroad and carriers by water. The respondents there-

fore cannot maintain any position on the strength of the contents of Section 305(b).

■ Does the Panama Canal Act as now constituted in part I, Section 6(11), 49 U.S.C.A. § 6(11), serve to support the respondents' position and that of Hoboken Railroad? The latter company lays particular emphasis on the provisions of the Panama Canal Act and has constructed a singularly ingenious argument in aid of its point of view. It points to the provisions of Section 6(11) as they now exist,[14] and in particular to that clause of the first paragraph which says when the transportation is from point to point in the United States by rail and water through the Panama Canal or otherwise, and not entirely within the limits of a single State, the "* * * Commission shall have jurisdiction of such transportation and of the carriers, both by rail and by water, which may or do engage in the same, * * * in addition to the jurisdiction * * * given by * * *" the Interstate Commerce Act as amended, "* * * in the following particulars * * *", viz., those set out in subparagraphs (a) and (b). The Hoboken Railroad lays emphasis on the phrase "in ad-

---

[13] We are not unmindful of the decisions of the Commission referred to in note 11, supra, or to that of the Supreme Court in Chicago, R. I. & P. R. Co. v. United States, 274 U.S. 29, 47 S.Ct. 486, 71 L.Ed. 911. In the case cited the Supreme Court held only that paragraph 13 of Section 6 of the Interstate Commerce Act read in conjunction with paragraph 4 of Section 15 of the Act (both sections being part of the Panama Canal Act as it existed prior to the enactment of the Transportation Act of 1940) gave the Commission power to compel a carrier by railroad to embrace in a through route by rail and water, through the Panama Canal, the transportation of passengers and of freight. The decision did not deal at all with any requirement of car service. Contrast the decision of the Supreme Court in St. Louis, etc., Ry. Co. v. Brownsville Nav. Dist., 304 U.S. 295, 300, 58 S.Ct. 868, 870, 82 L.Ed. 1357, decided in 1938. In the cited case, Mr. Justice Butler, after setting out the car service provisions of the Interstate Commerce Act as they existed prior to the passage of the Transportation Act of 1940 (unchanged by the latter Act except as to Section 6(14), stated, "The Act extends to transportation only so far as it takes place in this country.

Petitioners are not bound by any law, regulation, or tariff to furnish cars for transportation in Mexico." The Supreme Court, however, was dealing only with transportation by rail and not with transportation by rail and water.

[14] Section 6(13) of the Panama Canal Act as amended by the Transportation Act, 1920, 49 U.S.C.A. § 6(13), provides, "When property may be or is transported from point to point in the United States by rail and water through the Panama Canal or otherwise, * * * the Interstate Commerce Commission shall have jurisdiction of such transportation and of the carriers, both by rail and by water, which may or do engage in the same, in the following particulars, in addition to the jursidiction given by the Act to regulate commerce, as amended June eighteenth, nineteen hundred and ten:

"(a) To establish physical connection between the lines of the rail carrier and the dock at which interchange of passengers or property is to be made. * * *

"(b) To establish through routes and maximum joint rates between and over such rail and water lines, and to determine all the terms and conditions under which such lines shall be operated in the handling of the traffic embraced."

dition to the jurisdiction given by * * *" the Interstate Commerce Act and contends that these words enlarge the powers given to the Commission under the Act. This is true, but that enlargement of jurisdiction goes only to the particulars set out in subparagraphs (a) and (b). Subparagraph (a) deals with the establishment of physical connections between the lines of the rail carrier and the dock of the water carrier. Subparagraph (b) requires the establishment of proportional rates between the rail carrier and the water carrier. There is no aid here for the respondents. The fact is that the Panama Canal Act has been emasculated. If the statute stood as it did in former Section 6(13) (b) and the Commission had retained the power "* * * to determine all the terms and conditions under which such lines [rail and water] shall be operated in the handling of the traffic embraced * * *", the respondents' position would be a much stronger one.

■ Another argument can be made, however, which, perhaps, will indicate with some sharpness the issue of statutory interpretation presented for our determination. Section 303(a), 49 U.S.C.A. § 903(a) provides: "In the case of transportation which is subject both to this part and part I, the provisions of part I shall apply only to the extent that part I imposes, with respect to such transportation, requirements not imposed by the provisions of this part." These are words of limitation. They mean that the provisions of part I shall be applicable to transportation subject both to parts III and I only to the extent that part I makes them applicable.

Turn again to Section 1(1). May it be said that if transportation by rail to the port of ship-loading (say Hoboken) and transportation by rail from the port of ship-unloading (say Belle Chasse) takes place within the United States, carriers by railroad *must* interchange cars with Seatrain at these points, the whole of the ensuing transportation by water, (most of which takes place outside the territorial waters of the United States) becoming subject to all of the provisions of part I, those of Section 1(4) as well as the car service provisions contained in Section 1

(10), (11), (13) and (14)? In other words, should Section 1(1) be construed as if some such phrase as "by rail" were inserted between the words "transportation" and "takes" in its final clause?

■ We think that there are several answers to this argument. The first is that the last clause of Section 1(1), "but only in so far as such transportation * * * takes place within the United States * * *" modifies the whole sentence of which it is a part and therefore must be deemed to limit the application of the provisions of part I to transportation "from any place in the United States through a foreign country to any other place in the United States". The clause of limitation certainly does not limit only the phrase immediately preceding it. Second, the provisions of Section 1(1) by its own terms applies to transportation of property "partly by railroad and partly by water" and therefore it is manifestly improper to insert some such phrase as "by rail" as we have suggested. Such an interpretation would amount to rewriting the statute. Last, Section 1(2), 49 U.S. C.A. Sec. 1(2), reiterates the identical limitation enunciated in Section 1(1) and does so unqualifiedly.

■ It may be argued that the phrase of Section 1(1), "from any place in the United States through a foreign country to any other place in the United States", possesses little meaning when read with the clause of limitation. With this we may agree. The original Act to Regulate Commerce, 24 Stat. 379, while it made use of the phrase "from any place in the United States through a foreign country to any other place in the United States", contained no phrase of limitation such as that under consideration. In the Act of June 29, 1906, 34 Stat. 584, amending Section 1 of the Interstate Commerce Act, the phrase last quoted was used again without any words of limitation. The clause of limitation was brought into the Act by Section 400 of the Transportation Act, 1920, 41 Stat. 474, 49 U.S.C.A. § 1(1). We can find no legislative history which informs us adequately why it was inserted, but we must give to it the effect which we think Congress intended.[15] We conclude that it means precisely what it says

---

15 We have been unable to find any legislative history adequately explaining the inclusion of the clause "* * * but only in so far as such transportation * * * takes place within the United States.", first found in Section 400(1) of the Transportation Act, 1920, 41 Stat. 474. We have examined those

however inconsistent its provisions may seem when read with the phrase "from any place in the United States through a foreign country to another place in the United States." The effect of the limitation is to restrict the operation of the provisions of part I of the Interstate Commerce Act to transportation taking place within the United States. It follows that the provisions of Section 1(4) and Section 1(10), (11), (13), and (14), the car service provisions, are applicable to transportation "only insofar as such transportation * * * takes place within the United States". To conclude that the provisions of part I apply throughout the whole of a course of transportation, which,

though it goes from place to place within the United States, in part moves outside of the United States and its territorial waters, would be casuistry.

■ We can find no provision in the Interstate Commerce Act that imposes a duty upon carriers by railroad to exchange cars with carriers by water engaging as does Seatrain in transportation through extraterritorial waters and through a foreign port and we can find nothing in the Act which authorizes the Commission to impose such a duty on the petitioners.[16]

■ The Commission's order must be read against the background of the record. The record is clear as to the nature and

---

portions of the Congressional Record which report the discussions of the bills originally introduced in the Senate and in the House of Representatives. The House and Senate bills did not contain the clause. Both the Senate and the House submitted bills which did not contain the clause to the Conference Committee. The Conference Report sets out the clause under consideration for the first time. See House Report No. 650 to accompany H.R. 10453 (66th Congress, 2nd Session, 59th Cong. Rec. Part III, pp. 3043 et seq.). The report of the Committee contains no explanation for the clause. We have been unable to find any transcript of hearings before the Conference Committee. Available indices contain no reference to such hearings and their absence indicates that there were none.

We can find no textbook which deals with this particular clause, and we have been unable to find any pertinent discussion in any law review article.

The following discussion, which relates to the similar provision of what became Section 400(2) of the Transportation Act, 1920, took place in the House of Representatives on November 14, 1919. See 58 Cong. Rec. p. 8256.

"Mr. Edmonds. Mr. Chairman, I would ask the chairman of the committee a question. I move to strike out the last word.

"On page 39, sections (a) and (b), is it the intention of the committee to include our foreign commerce under the Interstate Commerce Commission, or to make rates and supervise and regulate?

"Mr. Esch. That does not change the existing law. It has been the law for years.

"Mr. Edmonds. That is true; but has the Interstate Commerce Commission operated in foreign Commerce?

"Mr. Esch. No. Its jurisdiction would

not extend beyond the 3-mile limit anyhow.

* * * * * * *

. "The gentleman will find the limitation as to transportation over which the committee has exercised jurisdiction on line 3, page 40, to the effect in so far as such transportation and transmission takes place within the United States. The words "within the United States" would not permit it to go beyond the 3-mile limit.

"Mr. Edmonds. That does not apply then, as I understand it, to the transportation of passengers or property outside the 3-mile limit?

"Mr. Esch. No."

The discussion quoted related as we have stated to the provision of subparagraph (2) of Section 400 of the Transportation Act, 1920, viz., "The provisions of this Act shall also apply to such transportation of passengers and property * * *, but only in so far as such transportation * * * takes place within the United States." The specific clause of subparagraph (1) was not included in the bill at the time the discussion took place, but it would seem that it must have been the intention of Congress to attribute the same meaning to identical clauses. Congressman Esch thought that the jurisdiction of Congress did not "go beyond the 3-mile limit" in respect to foreign commerce and that this view was generally accepted by his colleagues. Would it not follow, therefore, that the clause of subparagraph (1) should be given the same limiting effect? See the dissenting opinion of Mr. Esch, as a Commissioner of Interstate Commerce in International Nickel Co. v. Director General, 66 I.C.C. 627, 631.

[16] We are not unmindful of the rule of the ship's flag and that the nationality of American flag vessels by rule of law,

extent of transportation of cars by Seatrain beyond the United States and its territorial waters. We have decided that the provisions of the Interstate Commerce Act do not compel the petitioners to interchange cars with Seatrain for such service, nor do they confer authority upon the Commission to compel such interchange. Insofar as the order of the Commission relates only to transportation within the United States or its territorial waters, it will be sustained. Insofar as it serves to compel the petitioners to interchange cars with Seatrain for transportation beyond the United States and its territorial waters, in foreign waters or to a foreign port, it must be modified and limited.[17]

In reaching these conclusions we have endeavored to give to the Interstate Commerce Act the broadest justifiable construction in view of the intention of Congress as declared in the National Transportation Policy. We cannot legislate, however.

What we have said renders it unnecessary to discuss the last point raised by the petitioners; the question of whether the compensation fixed by the Commission for the use of the petitioners' cars is confiscatory.

An order may be submitted.

### On Argument in Respect to Form of Final Decree.

In our original opinion we stated that the conclusions reached by us rendered it unnecessary to discuss the last point raised by the petitioners; the question of whether the compensation fixed by the Commission for the use of the petitioners' cars is confiscatory. Counsel for Seatrain has now suggested the possibility, however impractical, that Seatrain might be able to maintain routes from Hoboken to Belle Chasse entirely within the United States and its territorial waters.[1] If this be the case, the issue of whether the compensation fixed by the Commission for the use by Seatrain of the petitioners' cars is confiscatory is not moot. There is also the consideration that if on appeal our decision that the Commission was without authority to compel the petitioners to interchange their cars with Seatrain for transportation beyond the United States and its territorial waters should be reversed, a remand would be necessary to permit this court to decide the issue of confiscation. We feel, therefore, that we should decide it now.

The order of the Commission imposes on Seatrain an obligation to pay to the petitioners $1 per day for each car supplied by them to Seatrain but provides also that this rate shall be paid by Seatrain only for the period in which the car is in the actual possession of Seatrain. The Commission thus has relieved Seatrain of the obligation to compensate the petitioners for the period of time during which a car may be held by Seatrain's connecting railroad carriers because there is no ship immediately available to receive the car at Hoboken or at Belle Chasse. The nature of this exception in Seatrain's favor is made plain by an examination of Rule 15 of the Car Service and Per Diem Agreement of the trunk line carriers. The rule is set out below.[2]

As the Commission states, there are two faces to the problem. See Hoboken Mfrs. R. Co. v. Abilene & S. Ry Co., 248 I.C.C. 109, 117-119. The Commission points out that the period of detention of cars before acceptance by Seatrain, longer in fact than the period of detention required by carriers by railroad, is the consequence of the nature of Seatrain's operation, ships sailing less frequently than trains run. Seatrain

---

comity and practice of nations remains that of the United States. See Taylor, International Public Law, Section 268. The doctrine, however, will not serve to extend the jurisdiction of the Interstate Commerce Act or the authority of the Commission.

[17] We think we should state that we can see no practical way in which Seatrain can operate its ships between Hoboken and Belle Chasse without going outside of the territorial waters of the United States. We appreciate the effect which this ruling, if it be sustained by the Appellate Tribunal, must have upon

Seatrain transportation. The remedy, however, must lie with Congress.

[1] There is no evidence in the record from which an opinion in respect to this question can be formed. Navigation maps and similar documents of which we may take judicial notice seem to indicate that such routes would be impractical.

[2] The pertinent provisions of Rule 15 are as follows: "(a) A road failing to receive promptly from a connection cars on which it has laid no embargo, shall be responsible to the connection for the per diem of the cars so held for delivery, including the home cars of such connection."

490

might well be obliged to assume the obligations imposed by its method of operation. But, as the Commission says, Seatrain's position in respect to car-detention is analogous to that of the break-bulk carriers by water. The disability of the break-bulk water carriers to accept merchandise promptly in all instances is reflected in the demurrage rates and presumably also in the rail rates and divisions applicable to traffic between them and the railroads. The Commission concludes that Seatrain's car-detentions are properly a matter for consideration in connection with the rates and divisions to be made between Seatrain and the petitioners rather than in determining the per diem rate which Seatrain should pay. The result, as the Commission points out, will be, or should be, much the same in either event for if the railroads are relieved by per diem payments by Seatrain of the burden of car detention which they bear on traffic interchanged with the break-bulk lines, the railroads will "* * * be entitled to relatively lower divisions of through rail-water rates with Seatrain than with the break-bulk lines, or to relatively lower local or proportional rates to or from the ports where the through rates are made on combination". The Commission goes on to state that: "Considerable difficulty, however, would be encountered in making any such adjustment. From a practical point of view, therefore, the simple and desirable way of handling the matter is to leave the burden of car detention with * * * [the petitioners] when traffic is interchanged with Seatrain just as when it is interchanged with the break-bulk lines." The finding set out below followed.[3]

A careful consideration of the record and the briefs of the parties convinces us that the determination of the per diem rate and of its method of application rested with the Commission in the exercise of its expert administrative judgment. We conclude that the per diem rate and the condition of its application are not confiscatory or even unreasonable. The rate and the condition of its application as ordered by the Commission in fact are not confiscatory even if petitioners' cars be carried from Hoboken to Belle Chasse via Havana. The per diem rate is applicable throughout the whole of the time that the cars are upon the Seatrain ships. The non-payment of the per diem rate during detention periods at Hoboken and Belle Chasse forms the substance of the petitioners' complaint.[4] We think that the findings and conclusions of the Commission have an adequate basis in the facts and in the law.

[3] The pertinent finding of the Board was as follows:

"2. We find further that the current code of per diem rules governing the interchange of freight cars between the defendants above referred to and other rail carriers, including the current rate of $1 per day payable by Seatrain for such period as the cars are in its actual possession, would be reasonable for application to the interchange of cars between defendants and complainants for use by Seatrain."

[4] As we have indicated, as we construe the Commission's opinion, findings and order, the Commission would permit Seatrain to transport the petitioners' cars by through routes from Hoboken to Belle Chasse and from Belle Chasse to Hoboken via Havana, the cars remaining on the Seatrain ships at Havana, and not entering into commerce on Cuban railroads.