## ALABAMA GREAT SOUTHERN R. CO. et al. v. UNITED STATES.

### Civ. A. No. 630.

United States District Court
E. D. Virginia.
At Alexandria.

Argued Dec. 14, 1951.

Decided Jan. 9, 1952.

Howard W. Smith, Jr., Gardner L. Boothe, Alexandria, Va., Charles T. Abeles, Norfolk, Va., James A. Bistline, Washington, D. C., Joseph F. Eshelman, Philadelphia, Pa., Richard B. Gwathmey, Wilmington, N.C., L. James Huegel, Baltimore, Md., J. Edgar McDonald, New York City, Paul V. Miller, Philadelphia, Pa., and Clarence Raymond, Louisville, Ky., for plaintiffs.

Edward M. Reidy and Daniel W. Knowlton, Washington, D. C., for Interstate Commerce Commission.

Edmund D. Campbell and Wilbur La Roe, Jr., Washington, D. C., for The Port of New York Authority, intervener.

L. Jackson Embrey, Arlington, Va., and S. S. Eisen, New York City, for Seatrain Lines, Inc., intervener.

William P. Woolls, Jr., Special Asst. to U. S. Atty., Alexandria, Va., for the United States.

Before DOBIE, Circuit Judge, and HUTCHESON and BRYAN, District Judges.

BRYAN, District Judge.

Forty-one eastern and southern railroads ask us to hold for naught the Interstate Commerce Commission's order of November 13, 1951 awarding Seatrain Lines, Inc. temporary authority to operate as a common carrier of freight by self-propelled vessels between New York harbor and Savannah, Georgia. The order is based on the ultimate finding of the Commission of "an immediate and urgent need" for such service between those points with "no carrier service capable of meeting such need", the statutory prerequisites to a grant of temporary authority.[1] This conclusion the plaintiffs assail, home and home. They say it was reached capriciously and arbitrarily. They indict it as unwarranted by the statute on the facts found—that the "need" and "no carrier service" premising the order are not those prescribed in the statute.

Seatrain was already authorized to ply its vessels by sea between New York, New Orleans and Texas City, Texas. Its method of transportation is to accept for shipmen loaded railroad cars, which have been placed alongside its ship on standard gauge tracks extended from a regular line of railroad, and by crane and cradle lift each car in its turn, swing it over the vessel, lower it to the assigned deck and then move it along the tracks laid on the deck to its berth. To discharge the cargo the process is reversed.[2] Six of these vessels are now in service and another is being readied, each with a carrying capacity of 100 cars.

The authorization, obtained on an ex parte hearing, was granted for a period of six months and issued under the provisions of section 311(a) in Part III of the Interstate Commerce Act, reading as follows:

"To enable the provision of service for which there is an immediate and urgent need to a point or points or within a territory having no carrier service capable of meeting such need, the Commission may, in its discretion and without hearings or other proceedings, grant temporary authority for such service by a common carrier by water or a contract carrier by water, as the case may be. Such temporary authority shall be valid for such time as the Commission shall specify, but not for more than an aggregate of one hundred and eighty days, and shall create no presumption that corresponding permanent authority will be granted thereafter."

The "immediate and urgent need", the Commission declared, was demonstrated by the port history, the port economy and the port demands of the Savannah area. We abridge the facts it found. Always acknowledged as a major Atlantic port, Savannah over a period of many years preceding World War II was the regular place of call of two steamship lines. German submarine warfare suspended this and all other coastwise shipping early in 1942. None had been restored at Savannah when the Commission's order was made. Industries had chosen the Savannah area for their plants because of the available coastal ship service. Their anticipated expansion was predicated on this service. Commercial ties with manufacturers in the northeast United States, and competition with other ports along the Atlantic oceanfront, were not maintainable by shippers in the Southeast without water transportation at hand at Savannah.

The Central of Georgia Railway Company urged the Commission to grant the authority. It showed that with its 1800 miles of track infiltrating Georgia, Alabama and Tennessee, it had interchanged freight at Savannah with the water-carriers then there to the extent of 7.8 per centum of its total revenue, or $10,612,516, for the decade ending with the outbreak of the Second War. At the other terminus of the proposed sea route were such sponsors of the authorization as the New

---

1. Sec. 311(a), Interstate Commerce Act, 49 U.S.C.A. § 911(a).

2. I. C. C. v. Hoboken R. Co., 320 U.S. 368, 371, 64 S.Ct. 159, 88 L.Ed. 107.

York Port Authority and the Susquehanna and Western Railroad Company. Numerous shippers and manufacturers in the States adjacent to both termini also requested it.

The Federal Maritime Board pressing this country's maritime policy—"It is necessary for the national defense and development of its foreign and domestic commerce that the United States shall have a merchant marine" [3]—called attention to the 1,861,900 tons of commodities water-borne between Savannah and New York in the period of 1939–42, with the amount steadily increasing, and advocated Seatrain's cause before the Commission.

■■ We think on this presentation the Commission was justified in finding in fact "an immediate and urgent need". It did not have an eye to cheaper rates, a factor admittedly irrelevant to a temporary permit. Nor was it capricious in not first fixing the terms of the protestants' future interrelations with the new carrier, such as per diem charges for car service, the withdrawal of cars from use during the voyages, their connections with Seatrain at the waterfronts, and similar mutual problems. However spectred, these difficulties did not so threaten the powers of the Commission as to question its competence to grant the authority at all. Solution of the problems as they might arise was certainly practicable, and perhaps more advisable than attempted solution by anticipation. Moreover, the statute conceives a summary disposition of the application. It contemplates a consideration only of the immediate incidence of the service, leaving to the plenary hearing, on the permanent authorization, decision of the points raised by the plaintiffs.

■ Fear that temporary entry of Seatrain upon its enterprise at Savannah may so entrench it there as to assure its permanent tenure, is dispelled by the statute itself. Furthermore, because of the extensive and costly character of every ship-

ping project, almost any temporary authority under Part III of the Act [4] would give this appearance, and if such apprehension is ground for denial of authority pendente lite, the statute is nullified. Lastly, Seatrain's method of operation does not declassify it as a carrier by water and render it ineligible for temporary authority under Part III of the Act. It has, of a surety, every characteristic of a common carrier of goods by sea.[5] The railroads' portrayal of its service as analagous to all-rail service, governed by Part I, is plausible but unsound, because unreal.

■ We accept, too, the Commission's interpretation of the statutory phrase "immediate and urgent need"; we reject the plaintiffs' view that the "need" must be an emergency. Witnesses before the Congressional committees may have cited emergencies to emphasize the necessity for the legislation, but the Congress itself did not frame temporary authorizations only for disasters or economic surprises. The "need" was not limited to the unforeseeable or unexpected—to that which might suddenly turn up. The Congress meant simply a present and pressing demand for water-transportation.

Next the Commission reported that "no carrier service capable of meeting" such need was to be found in Savannah. This is flatly denied by the plaintiff-railroads. They aver that the Commission erred in narrowing the words "no carrier" by reading them as "no water-carrier"; they urge the amplitude of rail service at Savannah as answering every carrier-need there.

■ The Commission thought, and we agree, that the statute does not foreclose consideration of "the economic needs of commerce and industry" for water-carriers just because there are present motor, rail or air carriers "physically capable" of providing transportation service to and from the particular point. A more straitened reading would mock the statute and

---

3. Merchant Marine Act, 1936, 46 U.S.C.A. § 1101.

4. Sec. 311(a), Interstate Commerce Act, 49 U.S.C.A. § 911(a).

5. Sec. 302(d), Interstate Commerce Act, 49 U.S.C.A. § 902(d); I. C. C. v. Hoboken R. Co., 320 U.S. 368, 371, 64 S.Ct. 159, 88 L.Ed. 107, supra.

the National policies. Scarcely is there a port in the United States without adequate rail service; therefore in actuality the provision for temporary authority would be meaningless if such authority were grantable only when other facilities were insufficient. Viability of water service was not to depend upon capability of other service. The latter was not to determine the creation or suppression of water service. Existence of other service is but one element to be considered. In this regard reason allows no distinction between temporary and permanent certificates.

Perhaps there may be circumstances in which the presence of transportation other than water-carriage can be found to satisfy every need. But certainly it cannot be so held until the National purpose to foster a merchant marine, the Nation's policy [6] to develop and preserve "a national transportation system by water, highway, and rail", and the area's reliance upon the water to provide it employment and industry as well as transportation, especially carriage of the kind afforded peculiarly by ships, have been weighed and discarded as unattainable or impracticable. Service, not simply transportation, is the stipulation of the statute. The Commission could not ignore these considerations. It would have erred had it reached its conclusion solely by measuring the physical ability of the existing rail service.

Adhering to these constructions of the Act the Commission has granted many orders of temporary authority under Part III.[7] This is strongly persuasive of their correctness.[8]

The failure of the Commission to accord the plaintiffs participation in the hearing was not an abuse of the discretion bestowed by the statute, wherein the Commission is empowered to award temporary authority "without hearings or other proceedings".[9] We have already alluded to the intendment of the Act that only on the hearing for permanent authority were all phases of the case and all parties affected to be heard. Nor do we deem the order impaired by the earlier contrary decision by the Commission, when the issue of need and service at Savannah was presented to it in a finance proceeding, for the issue there was tendered in environs wholly different from those here.

This cause was heard upon the application for the permanent as well as the preliminary injunction, and as we conclude that the order of the Commission is not contrary to law, the complaint will be dismissed, with costs to the United States.

---

6. Declaration preceding sec. 1, Interstate Commerce Act, 49 U.S.C.A. annotation preceding sec. 1.

7. See War Shipping Administration T. A. Application 260 I.C.C. 589, and 59th Annual Report of the Commission, pp. 33–34.

8. Brooks Transp. Co. v. U. S., D.C., 93 F. Supp. 517, 522.

