**SEATRAIN LINES, Inc. v. PENNSYLVA-
NIA R. CO. et al.**

No. C–1188.

United States District Court,
D. New Jersey.

Oct. 23, 1952.

As Amended Nov. 21, 1952.

Jamieson & Walsh, Crawford Jamieson, Trenton, for plaintiff, Carl E. Newton, Theodore S. Hope, Edward L. Meyer, New York City, of counsel.

Sackett M. Dickinson, John W. Griggs, Trenton, N. J., for Pennsylvania R. Co., George L. Haskins, Joseph F. Eshelman, Philadelphia, Pa., Covington & Burling, Hugh B. Cox, Washington, D. C., of counsel.

John W. Griggs, Trenton, N. J., for Presidents' Traffic Conference-Eastern Railroads, Traffic Executive Ass'n-Eastern Railroads, General Freight Traffic Committee-Eastern Railroads, Freight Traffic Committee-New England Territory Railroads, Freight Traffic Committee-Trunk Line Territory Railroads and Freight Traffic Committee-Central Territory Railroads, Debevoise, Plimpton & McLean Samuel E. Gates, Robert B. Von Mehren, New York City, of counsel.

Pitney, Hardin & Ward, Waldron M. Ward and Robert P. Hazlehurst, Jr., Newark, N. J., for Atlantic Coast Line R. Co., Shea, Greenman, Gardner & McConnaughey, Francis M. Shea, Washington, D. C., Charles Cook Howell, Wilmington, N. C., of counsel.

Carey, Schenk & Jardine, Newark, N. J., Robert Carey, Jersey City, N. J., Thomas V. Jardine, Newark, N. J., for Louisville & N. R. Co., H. T. Lively, Louisville, Ky., of counsel.

Pitney, Hardin & Ward, Waldron M. Ward and Robert P. Hazlehurst, Jr., Newark, N. J., for Southern Ry. Co., Shea, Greenman, Gardner & McConnaughey, Francis M. Shea, Sidney S. Alderman, Herny L. Walker, Washington, D. C., of counsel.

Markley & Broadhurst, James J. Langan, Jersey City, N. J., for Baltimore & O. R. Co., L. James Huegel, Baltimore, Md., Covington & Burling, Hugh B. Cox, Washington D. C., of counsel.

Minard, Cooper, Gaffey & Webb, Duane E. Minard, Newark N. J., for Erie R. Co.

Pitney, Hardin & Ward, Waldron M. Ward and Robert P. Hazlehurst, Jr., Newark, N. J., for Association of American Railroads, J. Carter Fort and Thomas L. Preston, Washington, D. C., of counsel.

Pitney, Hardin & Ward, Waldron M. Ward and Robert P. Hazlehurst, Jr., Newark, N. J., for Seaboard Air Line R. Co., James B. McDonough, Jr., Charles T. Abeles, Norfolk, Va., Harold J. Gallagher, New York City, W. R. C. Cocke, Norfolk, Va., of counsel.

O'Mara, Schumann, Davis & Lynch, Joseph A. Davis, Jersey City, N. J., for New York Cent. R. Co., Dorr, Hand & Dawson, George W. Whittaker, New York City, of counsel.

FORMAN, Chief Judge.

—I—

So much of the amended complaint filed by the plaintiff, Seatrain Lines, Inc. (hereinafter called Seatrain), as is essential to the present considerations, charges as follows:

In 1929 Overseas Railways, Inc. began to carry goods between the ports of New York and New Orleans, via Havana, Cuba. On December 31, 1931 Seatrain acquired its net assets and it was merged and consolidated with Seatrain on October 14, 1933. In October of 1932 Seatrain inaugurated its interstate service between the ports of New York and New Orleans, via Havana, Cuba. In or about June of 1940 it added a service between the ports of New York and Texas City, Texas and on November 30, 1951 it added a further service between the ports of New York and Savannah, Georgia.

Seatrain developed a special type of vessel for the carriage of freight in railroad cars over the long distances in ocean routes. Each of the vessels used by Seatrain is so constructed that it can carry 100 railroad cars on four decks. Special equipment is provided to hoist these cars from adjacent tracks on the docks and move them bodily into the vessels. This procedure makes it unnecessary for goods carried to the ports in railroad cars to be unloaded from the cars and carried piecemeal into the vessels.

Seatrain maintains physical facilities for the interchange of freight cars at dockside at the Port of New York (Edgewater, New Jersey), with the New York, Susquehanna and Western Railroad Company; at the Port of New Orleans (Belle Chasse, La.) with the New Orleans and Lower Coast Railroad Company; at Texas City, Texas, with the Southern Pacific Lines; Missouri Pacific Lines; Gulf, Colorado & Santa Fe; Missouri, Kansas & Texas; Fort Worth & Denver; Chicago, Rock Island & Pacific, and the Texas City Terminal Railroad; and at Savannah, Georgia, with the Central of Georgia Railway Company.

In May of 1942 all of Seatrain operations were suspended as a result of the requisition of its ships, then five in number, for use by the United States in World War II. On March 12, 1947, its vessels having been returned to it by the government and reconditioned, it assumed its coastwise freight services. Two additional vessels were built and placed in operation in the latter part of 1951.

There are 10 defendants who are common carriers by rail engaged in the transportation of commodities in interstate commerce within the United States, namely: Pennsylvania Railroad Company, Atlantic Coast Line Railroad Company, Southern Railway Company, Louisville & Nashville Railroad Company, Lehigh Valley Railroad Company, Baltimore and Ohio Railroad Company, Seaboard Air Line Railroad Company, St. Louis-San Francisco Railroad Company, New York Central Railroad Company and Erie Railroad Company.

Also named as defendants are seven unincorporated associations of railroad corporations alleged to be supported, maintained and utilized by railroads, including the defendant railroads. The defendant associations are: Association of American Railroads, Presidents' Traffic Conference-Eastern Railroads, Traffic Executive Association-Eastern Railroads, General Freight Traffic Committee-Eastern Railroads, Freight Traffic Committee-New England Territory Railroads, Freight Traffic Committee-Trunk Line Territory Railroads, and Freight Traffic Committee-Central Territory Railroads.

The first four defendants, Pennsylvania Railroad Company, Atlantic Coast Line Railroad Company, Louisville & Nashville Railroad Company and Southern Railway Company, are the primary defendants in a combination and conspiracy, together with other railroads and the defendant Association of American Railroads and the other defendant corporations. The remaining six railroads are secondary defendants, having been induced by the pri-

mary defendants to join in said combination and conspiracy.

Seatrain is a holder of a Certificate of Public Convenience and Necessity issued to it by the Interstate Commerce Commission authorizing continuance of its operations between the ports of New York, New Orleans and Texas City and the grant of temporary authority to operate between the ports of New York and Savannah, similarly issued on November 13, 1951.

Except for the suspension of its service in World War II, as aforesaid, Seatrain has been operating continuously since 1932 in competition with railroads for interstate freight traffic between areas tributary to the gulf ports and areas tributary to the Port of New York, and since November 30, 1951 has been in similar competition for such traffic between areas tributary to the Port of New York and the Port of Savannah.

Seatrain transports freight generally at lower rates than the railroads and by using Seatrain service shippers are saved packing and handling expenses necessarily incurred when freight is shipped over break-bulk water routes. In addition, certain classes of bulk freight which cannot be handled in vessels of the usual type and which cannot bear all rail charges can be handled by Seatrain and thus markets are opened up for them which otherwise could not be reached.

The interstate commerce involved is primarily transportation of freight in loaded freight cars, principally conducted by common carriers by rail but Seatrain and certain railroad-owned or controlled water carriers (commonly known as "car ferries"), are, and have been, engaged therein.

The goods shipped all-rail from points in the northeast to points in the south or southwest must be transported over the lines of more than one railroad since the lines of no one railroad extend into both these territories; such transportation is effected, successively, by the several railroads whose lines are involved, each utilizing its own personnel, tracks, right of way, motive power, and other fixed and movable equipment, other than freight cars, but the car itself in which the freight is originally loaded, which may be owned by the railroad on which the traffic originated, by some other railroad participating in the haul, or by some railroad not participating therein, is loaded for shipment at the point of origin and hauled from point of origin to point of destination over all the lines of railroad involved, without unloading or reloading enroute.

Mutual and reciprocal arrangements between railroads of the United States, including all of the defendant railroads, have existed for many years under which railroad-owned freight cars are loaded, hauled, and delivered in interchange without restriction between the various railroads and have been used in continuous haul over the various railroads of the United States regardless of railroad ownership of the freight cars and of the railroads participating in the haul.

By such arrangements and agreements each railroad foregoes for the benefit of other railroads its right to control the use of its own freight cars (within limitations imposed by the Interstate Commerce Commission) and thereby surrenders such competitive advantage as it would otherwise possess as the owner of freight cars and the arrangements amount to, in effect, unrestricted, reciprocal licensing by each railroad of all other railroads in interchanging the cars owned by one railroad and that each railroad thereby acquires competitive advantages which it would not have if it would not have participated in such arrangements and agreements, and as a group the railroads of the country thereby acquire competitive benefits which they would not have if it were not for such arrangements and agreements.

In implementation and furtherance of such arrangements and agreements the defendant Association of American Railroads, voluntarily organized by the railroads of the country to regulate and administer them, promulgated the "Car Service and Per Diem Agreement" providing for the loading, interchanging, routing, handling, etc., of cars in interstate commerce for their rental both by the railroads

using such cars and the railroads which own the cars so used and for matters relating to payment therefor.

Water carriers are not eligible as subscribers to such car service and per diem agreement now in effect and cannot practically become subscribers if eligible since many of the rules are drawn so as to fit the operating conditions and methods of railroads and are not applicable in certain respects to the operation of water carriers.

The ability of Seatrain to compete depends upon the lower rates (under which it can operate at a profit) which it can offer to shippers, the lower cost of packaging, handling, etc., and the more expeditious service via Seatrain as compared with the conventional type of water carrier service. Such competitive factors enable shippers to reach markets in which they cannot otherwise sell, but shippers cannot prudently enter into sales and other commitments based upon such lower rates, etc., unless assured that Seatrain will not be prevented from rendering the service at such rates upon which such shippers have relied in pricing their goods, selecting their markets and making their sales and shipping commitments.

The amended complaint further alleges that the defendants and other rail carriers in the United States since 1932 have been and are engaged in a combination and conspiracy in restraint of interstate trade and commerce in the transportation of freight and loaded freight cars in violation of section 1 of the Sherman Act, 15 U.S.C.A. § 1, and have conspired to, and attempted to, monopolize and have monopolized such trade and commerce in violation of section 2 of the said Act, 15 U.S.C.A. § 2, with intent to drive Seatrain out of business as a competitor of railroads, including particularly the primary defendants, and pending accomplishment of such purpose, they intend to restrain and limit Seatrain's development and expansion as a competitor of railroads, thereby depriving shippers and potential shippers of the economic and other benefits inherent in Seatrain's service and preventing them from having access to markets in which they would have been able to sell their products if they could have taken advantage of the lower transportation costs, etc. of Seatrain's services.

As far back as 1932 the defendants, by their joint action with other railroads, added to the Code of Car Service Rules of the Association of American Railroads the following, known as Rule No. 4:

"Cars of Railway ownership must not be delivered to a steamship, ferry or barge line for water transportation without permission of the owner filed with the Car Service Division."

This rule was directed specifically against Seatrain with the sole object of monopolizing traffic for the all-rail routes to the exclusion of Seatrain, and although the said rule in form is applicable to the railroad-owned or controlled freight car ferries it was not intended to restrict and in practice has not restricted the use and interchange by them of railroad-owned freight cars since no railroads have refused to permit delivery of their cars to such car ferries. Only Seatrain is thus affected.

None of the primary defendants has currently on file with the Car Service Division of the Association a consent under Car Service Rule 4 to the delivery of its cars to, or the use of its cars by, Seatrain. Other railroads acting in concert with them have likewise refused to consent, have from time to time withdrawn consents previously filed and have filed limited consents to Seatrain's use of their cars, and any or all of the railroads whose consents are so on file may at any time withdraw them. The purpose and effect of said Rule 4, as administered by the Association at the instance of the defendants, is and has been to deny to Seatrain the free use and interchange of cars.

Seatrain has been made the victim of a boycott with regard to the use of cars belonging to the primary defendants and such other parties as they from time to time could induce to deny such use to Seatrain. The Association has acted for all members of the conspiracy in furthering the boycott by imposing and encouraging embargoes against Seatrain and other activities. The boycott has been extended against Seatrain with regard to the voluntary establishment of through routes, joint rules, divisions,

charges and allowances in connection with interchange and otherwise for handling freight which the participants in the boycott have remained free to enter and regulate, except where Seatrain was concerned. The shipment of goods via Seatrain has been obstructed in a number of ways enumerated, among which were the cancelling of arrangements for rail-water shipment from ports served or proposed to be served by Seatrain; misinforming shippers and potential shippers as to Seatrain's service to induce them to ship via its railroad competitors; placing spies in Seatrain's offices; publishing publicly and to shippers statements designed to indicate or emphasize the uncertainty of Seatrain's service and the economies inherent therein, when such uncertainty did not exist for the purpose of destroying confidence in shippers that they could safely enter into marketing arrangements to sell their products in reliance upon Seatrain's service.

As a direct result of the conspiracy Seatrain has been drawn into numerous lengthy proceedings before the Interstate Commerce Commission and the courts ever since its commencement of the operation of coastwise routes in competition with the railroads in 1932. The litigation has been fomented and maintained, needlessly and vexatiously, by the primary defendants and others in combination with them in order to make more complete the boycott and to drain Seatrain of its financial resources and the energies of its executive officers thereby to weaken Seatrain's operation and development.

The restraints imposed upon Seatrain's competition have caused it to suffer great damages in excess of the sum of $54,721,-000 to the date of suit. They continue currently and will in the future cause it to be damaged heavily wherefor Seatrain claims treble damages against the primary defendants and an injunction restraining all of the defendants from the several conspiratorial activities enumerated in the complaint.

—II—

Seatrain has moved for a preliminary injunction to restrain the defendants Pennsylvania Railroad Company, Atlantic Coast Line Railroad Company, Louisville & Nashville Railroad Company, Southern Railway Company, Baltimore and Ohio Railroad Company, Seaboard Air Line Railroad Company, St. Louis-San Francisco Railroad Company, Erie Railroad Company, and Association of American Railroads from a continuance of the acts alleged in the amended complaint. Affidavits in support of the motion were filed by Graham M. Brush, President of Seatrain. Counter affidavits were filed in resistance to it and reply affidavits were submitted by plaintiff.

Motions to dismiss the amended complaint, principally because this court lacks jurisdiction over the subject matter because the matters complained of fall within the exclusive or primary jurisdiction of the Interstate Commerce Commission and because the suit cannot be sustained under section 16 of the Clayton Act 15 U.S.C.A. § 26, were filed by the Pennsylvania Railroad Company, Atlantic Coast Line Railroad Company, Southern Railway Company, Baltimore and Ohio Railroad Company, Seaboard Air Line Railroad Company, New York Central Railroad Company, Erie Railroad Company and the Association of American Railroads. Affidavits and counter affidavits addressed to these motions have been filed.

Motions to dismiss the action on similar grounds as well as for invalid service were also made by the defendant railroad associations, namely, Presidents' Traffic Conference-Eastern Railroads, General Freight Traffic Committee-Eastern Railroads, Freight Traffic Committee-New England Railroads, Freight Traffic Committee-Trunk Line Territory Railroads, and Freight Traffic Committee-Central Territory Railroads.

Seatrain withdrew those of its prayers for relief* which applied in respect of al-

---

* The prayers for relief so withdrawn appear in paragraph 1 of the prayer set forth in the amended complaint. The

specific prayers for relief so withdrawn and eliminated from the amended complaint are those contained in the follow-

leged subsidiary means which are largely dependent for their effectiveness upon the continued exclusion of Seatrain from access to the national freight car pool, eliminating from its complaint those prayers which relate to relief in respect to through routes, joint rates divisions, bills of lading, switching, bill credit and loss and damage claims, concededly rendering moot any prayer for injunctive relief against the six unincorporated defendant associations, other than the Association of American Railroads. The plaintiff consented to an order dismissing the action against these defendants without prejudice.

The Louisville & Nashville Railroad Company moved to quash the summons, service and the return upon it and to dismiss the complaint, and argument on this motion was held in abeyance. The plaintiff has also assented to the dismissal of the complaint against the Delaware, Lackawanna & Western Railroad Company, and the remaining defendant, St. Louis-San Francisco Railroad Company, has secured continuances of its time to plead to the complaint.

Lehigh Valley Railroad Company filed an answer containing as affirmative defenses the substance of the said motions to dismiss the complaint.

The pending respective motions for preliminary injunction and for dismissal of the amended complaint have been argued orally and on briefs, and the arguments made by any or all of the defendants have been treated as if made on behalf of each defendant.

—III—

The railroads of the country, pursuant to the direction of the Interstate Commerce Commission, have by mutual agreement and through their agency, the Association of American Railroads, constructed a scheme for the automatic interchange of freight cars and have adopted rules and regulations governing such interchange and compensation therefor. The latter are embodied in the Code of Car Service Rules, known as the Car Service Per Diem Agreement. It is published, administered and supervised by the Association.

Seatrain takes only one exception to these rules and insists before this court that it desires only to be integrated into the system so that it may have the same access to the national supply of freight cars as have the railroads.

Only Car Service Rule 4, which provides that railroad-owned freight cars shall not be delivered to water carriers without the consent of the car owners filed with the Car Service Division of the Association, offends Seatrain, for it asserts it is aimed at it to prevent its access to freight cars on the same level as railroads. Some railroads have filed such consents, but it is apparent that other railroads, including some of the defendants, have felt that in its capacity for the transportation of trains or freight cars on coast wise runs Seatrain looms as a substantial competitor to rail carriers now and has future potentialities of being even a greater threat. These railroads see that Seatrain's water facilities permit the transportation of cars at cheaper costs than the railroads incur, enabling Seatrain to offer its services at rates more favorable to the shipper than those of the railroads. They also assert that Seatrain should not be entitled to uncontrolled access to freight cars on the same basis as rail carriers because it is not, indeed, a rail carrier. It owns no freight cars which could be the subject of interchange.

Seatrain points out that there are railroad carriers which, too, do not own freight cars and that in any event it would be willing to purchase and maintain cars.[1]

ing subparagraphs of paragraph 1 of the prayer: (j), (k), (l), (m), (n), (r), (u), (w), and, to the extent that they relate to the matters covered by said subparagraphs but not as they relate to other subparagraphs of paragraph 1, subparagraphs (p) and (q). In addition, subparagraph (o) of paragraph 1 of the prayer was modified by the elimination of the words "or any other unincorporated association" appearing after the words "the Association." Except as so withdrawn and modified, paragraph 1 of the prayer remains unchanged.

1. See affidavit of Mr. Graham M. Brush, President of Seatrain Lines, Inc., dated April 12, 1952.

Seatrain declares that the device of Car Service Rule 4 and its administration by the Association constitute the main mechanism whereby the railroads operate to thwart it of access to freight cars. It also alleges that incidental to it the primary defendants and others and the Association activate themselves in a number of ways, which amount to a boycott of Seatrain as far as delivery to it and use by it of freight cars are concerned; these activities have been given added impetus anticipatory to and since the inauguration of its Port of New York to Savannah service in November of 1951. Some of these activities are manifest in the publication, coincidental as to time and verbiage, of embargoes against the movement of freight in Seatrain service; publication of tariff provisions denying the existence of through routes with Seatrain; taking advantage of the technicality in the change by Seatrain of its Port of New York Terminal from Hoboken to Edgewater, when it resumed service in 1947, on the ground that consents which had been given subsequent to the 1945 decision of the Supreme Court in United States v. Pennsylvania R. Co., 323 U.S. 612, 65 S.Ct. 471, 89 L.Ed. 499, were valid only as to Hoboken, named as the terminal in the Commission's order, and are not binding as to Edgewater, the terminal substituted since the Commission's order; and a new and extended interpretation of Car Service Rule 4 by the Association prohibiting not merely delivery of cars to Seatrain but their use in any way in connection with Seatrain's service. By this design and intimations to shippers that Seatrain could not effectively carry on its service, made by some of the defendants, shippers, according to Seatrain, were intimidated from dealing with it. All of these activities Seatrain holds constitute a combined effort to restrict Seatrain from carrying on its business to its great damage and that of the public and its sole remedy therefor is under the provisions of the antitrust laws. Seatrain avers that the combination must be enjoined unless it is opened up so that the benefits of the collective action are made available to Seatrain as well as to the railroads.

Absent the jurisdiction and power of the Interstate Commerce Commission to direct the railroads to give Seatrain access to freight cars except where through routes with Seatrain in interstate commerce are concerned, Seatrain argues that the combination is a simple breach of the antitrust laws for which it is entitled to relief by way of injunction and damages under such decisions of the United States Supreme Court as United States v. Terminal Railroad Association of St. Louis, 1912, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810; Standard Oil Co. (Indiana) v. United States, 1931, 283 U.S. 163, 51 S.Ct. 421, 75 L.Ed. 926; State of Georgia v. Pennsylvania R. Co., 1945, 324 U.S. 439, 65 S.Ct. 716, 89 L. Ed. 1051 and Associated Press v. United States, 1945, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013.

Seatrain leans heavily on the case of State of Georgia v. Pennsylvania R. Co., supra, which it claims precisely covers its allegations in this case. There the State of Georgia charged in its complaint in essence that the defendant railroads had entered into a conspiracy in restraint of trade and commerce among the states to fix arbitrary and non-competitive rates and charges for transportation of freight by railroad to and from Georgia so as to prefer the ports of other states over the ports of Georgia. It alleged that the defendants utilized boards, committees, conferences, associations and other private rate fixing agencies to fix the rates charged and no road could charge joint through rates without the approval of these private agencies and that private rate fixing machinery not sanctioned by the Interstate Commerce Act and prohibited by the antitrust laws had put effective control of rates to and from Georgia in the hands of the defendants; that the defendants who have lines wholly or principally in the south are generally dominated and coerced by the defendants who have northern roads so that even when the southern defendants desired they could not publish joint through rates between Georgia and the north when the northern carriers refused to join in such rates, the result of such practices in purpose and

effect giving manufacturers, sellers and other shippers in the north an advantage over manufacturers, shippers and others in Georgia. The rates so fixed were allegedly approximately 39% higher than the rates and charges for transportation of like commodities for like distances between points in the north. It sued for damages and for injunctive relief.

The court held that the state was not entitled to recover damages, but that the injunctive relief sought by the state against the alleged rate fixing combination and conspiracy among the defendant carriers is not a matter over which the Interstate Commerce Commission had jurisdiction and that the relief sought was not such as is available under § 16 of the Clayton Act only in a suit brought by the United States.[2] The Supreme Court granted permission to file the complaint.

The plaintiff herein insists that its situation is on all-fours with that of the State of Georgia. It says that its complaint discloses that the defendants have arranged an apparatus by way of a private agency, namely, the Association of American Railroads, and the processes of filing consents by railroads for the use of their freight cars pursuant to Car Service Rule 4, which is entirely analogous to the rate fixing machinery set up in the Georgia case.

The reasoning of the Supreme Court in the Georgia case was that the complaint stated a cause of action because it could be construed as charging a conspiracy among the defendants to use coercion in the fixing of rates and to discriminate against Georgia in the rates which were fixed; that damages must be presumed to flow from a conspiracy to manipulate rates within that zone of reasonableness (between maxima and minima) within which a carrier is ordinarily free to adjust its charges for itself within that zone and the Commission lacks power to grant relief even though the rates are raised to the maxima by the employment of unlawful conspiratorial tactics. The Court held that:

"The present bill does not seek to have the Court act in the place of the Commission. It seeks to remove from the field of rate-making the influences of a combination which exceed the limits of the collaboration authorized for the fixing of joint through rates. It seeks to put an end to discriminatory and coercive practices. The aim is to make it possible for individual carriers to perform their duty under the Act, so that whatever tariffs may be continued in effect or superseded by new ones may be tariffs which are free from the restrictive, discriminatory, and coercive influences of the combination. That is not to undercut or impair the primary jurisdiction of the Commission over rates. It is to free the rate-making function of the influences of a conspiracy over which the Commission has no authority but which if proven to exist can only hinder the Commission in the tasks with which it is confronted." 324 U.S. at pages 459–460, 65 S.Ct. at page 727.

The court cautioned that it was dealing with the case only in a preliminary manner but assuming that the alleged combination could be shown to exist it held

" * * * coercion can be enjoined. And so can a combination which has as its purpose an invidious discrimination against a region or locality. Dissolution of illegal combinations or a restriction of their conduct to lawful channels is a conventional form of relief accorded in anti-trust suits. No more is envisaged here. If the alleged combination is shown to exist, the decree which can be entered will be no idle or futile gesture. It will restore that degree of competition envisaged by Congress when it enacted the Interstate Commerce Act. It will eliminate from rate-making the collusive practices which the anti-trust laws condemn and which are not sanctioned by the Interstate Commerce Act. It will sup-

2. Subsequent to the decision in this case, in 1948, Congress enacted legislation authorizing the conference method of rate making subject to the approval of the Commission, 49 U.S.C.A. § 5b.

ply an effective remedy without which there can be only an endless effort to rectify the continuous injury inflicted by the unlawful combination. * * * And no adequate or effective remedy other than this suit is suggested which Georgia can employ to eliminate from rate-making the influences of the unlawful conspiracy alleged to exist here." 324 U.S. at page 462, 65 S.Ct. at page 728.

3. Except for the period of World War II and thereafter (1942 to 1947), when it was in the government's hands, Seatrain has been involved in proceedings before the Interstate Commerce Commission and the courts since its service was initiated 20 years ago, until the number of such actions total fourteen.

They are listed in the pending petition of The Alabama Great Southern Railroad Company, et al., v. Seatrain Lines, Inc., et al., before the Interstate Commerce Commission, Docket No. 31014, as follows:

(1) New Orleans and Havana Car Ferry Service, No. 24119, 188 ICC 371 (1932)—Application of Florida East Coast Railway Company for permission to operate FEC Car Ferry Company service between New Orleans and Havana; opposed by Seatrain.

(2) Participation of Seatrain Lines in Classification, I & S 3834, 194 ICC 309 (1933)—Elimination of Seatrain as participating carrier in Southern Classification.

(3) Investigation of Seatrain Lines, Inc., No. 25565, 195 ICC 215 (1933); 206 ICC 328 (1935)—Investigation on Commission's own motion into status of Seatrain.

(4) Application of Missouri-Pacific Railroad Company et al., No. 25546, 206 ICC 328 (1935); 245 ICC 143 (1941)—Application of Missouri Pacific Railroad Company and The Texas and Pacific Railway Company under Panama Canal Act to determine lawfulness of their stock interest in Seatrain.

(5) Hoboken Manufacturers Railroad Company v. Abilene & S. Rwy. Co., Nos. 25728 and 25878, 206 ICC 328 (1935); 237 ICC 97 (1940); 248 ICC 109 (1941); Pennsylvania R. Co. v. U. S., D.C., 55 F. Supp. 473; U. S. v. Pennsylvania R. Co., 323 U.S. 612, 65 S.Ct. 471, 89 L. Ed. 499—Car interchange.

(6) Seatrain Lines, Inc. v. Akron, C. & Y. Ry. Co., No. 25727, 226 ICC 7 (1938); 243 ICC 199 (1940); 259 ICC 297 (1944)—Through routes and joint

The ruling of the Supreme Court in the Georgia case can only govern this case if, here as there, the relief sought is not a matter subject to the jurisdiction of the Commission.

Seatrain has engaged in many controversies before the Interstate Commerce Commission and in the review of five of its decisions before the courts.[3] Seatrain views as futile any further appeal to the Commission since it has repeatedly deter-

rates. The reports in these proceedings also cover: No. 27445, Agwilines v. Seatrain; No. 27011, Gulf Refining Co. v. Central R. R. of New Jersey; I & S No. 4542, Class Rates via Seatrain.

(7) Hoboken Manufacturers Railroad Company v. Akron C. & Y. Ry. Co., No. 27630, 234 ICC 114 (1939); Hoboken Manufacturers' R. Co. v. U. S., D.C., 47 F.Supp. 779; Interstate Commerce Comm. v. Hoboken R. Co., 320 U.S. 368, 64 S.Ct. 159, 88 L.Ed. 107—Divisions between Hoboken Manufacturers Railroad Company, Seatrain's subsidiary, and the railroads.

(8) Seatrain Lines, Inc., Common Carrier Application W-543, 250 ICC 816 (1942); 260 ICC 430 (1945); Seatrain Lines v. U. S., D.C., 64 F.Supp. 156; U. S. v. Seatrain Lines, Inc., 329 U.S. 424, 67 S.Ct. 435, 91 L.Ed. 396—Modification of Seatrain certificate.

(9) West India Fruit & Steamship Co. v. Seatrain Lines, 2 Cir., 170 F.2d 775—Rate-cutting from New Orleans to Havana.

(10) Seatrain Lines, Inc., Application for Temporary Authority, No. W-543 (Sub.No.2), decided Nov. 13, 1951; injunction denied and complaint dismissed, Jan. 9, 1952. Alabama Great Southern R. R. Co. v. United States, D.C.E.D. Va., 103 F.Supp. 223—Savannah application.

(11) Class Rate Investigation, 1939 No. 28300—Ocean-rail rate phase of general investigation pending. Examiner's proposed report issued.

(12) Pan-Atlantic Steamship Corp., Extension-Houston, W-376 (Sub.No.10), decided Aug. 9, 1951—Pan-Atlantic authority into Houston, opposed by Seatrain. Review proceedings of Commission's order pending before U. S. District Court for Southern District of New York; Seatrain intervening.

(13) Routing Restrictions via Seatrain Lines, Inc., I & S No. 5979, C-30594—Pending, suspension and investigations of announcements of absence of through routes with Seatrain.

mined that its jurisdiction to compel access to freight cars is limited to through routes between rail and water carriers established pursuant to its order or voluntarily. In Investigation of Seatrain Lines, Inc., 206 I.C.C. 328 (1935) Seatrain asserts that it urged upon the Commission that the provisions of §§ 1(4), 1(10 to 17), 3(4), 7 and 15(3) of the Interstate Commerce Act, 49 U.S.C.A. §§ 1(4), 1(10 to 17), 3(4), 7 and 15(3), conferred upon the Commission jurisdiction to require interchange with Seatrain independently of the through route provisions and that defendants in this case who appeared before the Commission in it and in other proceedings before the Commission and the courts insisted that the Commission was without jurisdiction to require such interchange under those provisions, with which contention the Commission agreed, saying:

"It is our view that we have jurisdiction to require the establishment of through routes between rail and water carriers, and, where such routes are established pursuant to our order or voluntarily, to require the interchange of cars between the rail and water carriers, and to require that equality of treatment provided by section 3(3) between connecting carriers, whether rail or water, in the facilities for the interchange of traffic, including through routes and the interchange of cars. We find nothing in the act imposing any duty upon or giving us jurisdiction to require a rail carrier to permit delivery of its cars to a water carrier where through routes between such rail and water carriers do not exist." 206 I.C.C. at p. 343.

Seatrain points out that the Commission specifically held that it was not empowered under Section 7 to require interchange with Seatrain except in the case of through routes as aforesaid, although it had in mind Car Service Rule 4. (See pp. 343–344 and 337–338). And again in its decision in Seatrain Lines, Inc. v. Akron, Canton & Youngstown Railway Co., et al. v. 226 I.C.C. 7, the Commission expressly stated:

"We have found that we are without jurisdiction to require a rail carrier, in the absence of through routes, to deliver its cars to a water carrier. While it is the duty of a rail carrier to furnish cars upon reasonable request therefor, we may not, in the absence of through routes, require it to furnish cars that are to be delivered to a water carrier contrary to the express directions of the owners of the cars * * *" 226 I.C.C. at p. 30.

Seatrain further shows that in 1941 in the case of Hoboken Manufacturers Railway Co. v. Abilene & Southern Railway Co., et al., 248 I.C.C. 109, the defendants in this case who appeared there reiterated their contention that the Commission was without any power to require them to permit use of their cars by Seatrain and the Commission maintained its position that it had such power but only where through routes had been established between rail and water carriers to require the interchange of cars between them (p. 110). This decision of the Interstate Commerce Commission was reviewed by a 3-judge court of this district, which is reported in Pennsylvania R. Co. v. United States, D. C.1943, 55 F.Supp. 473, which was in turn appealed to the United States Supreme Court, and its decision is found in United States v. Pennsylvania R. Co., 1945, 323 U.S. 612, 65 S.Ct. 471, 89 L.Ed. 499. Seatrain interprets the decision of the United States Supreme Court as not effecting the holding of the Interstate Commerce Commission that it had jurisdiction to require a railroad to permit interchange of its cars with Seatrain only where such cars were used over an interstate through route between such railroads and Seatrain.

The Court referred to the division of the 1940 Transportation Act into three parts, the first relating to railroads, the second to motor vehicles and the third to water carriers, and noted that:

"The interrelationship of the three parts of the Act was made manifest by its declaration of a 'national transportation policy of the Congress to pro-

(14) Seatrain Lines, Inc., Application for permanent authority, No. W-543

(Sub.No.3)—Savannah operations—hearings assigned.

vide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each.' The declared objective was that of 'developing, coordinating and preserving a national transportation system by water, highway, and rail, * * * adequate to meet the needs of the commerce of the United States * * *.' Congress further admonished that 'all of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy.'" 323 U.S. at pages 616–617, 65 S.Ct. at page 474.

The policy is then applied by the Court to the specifics of Seatrain's problem of interchange in the following language:

"This policy cannot be carried out as to Seatrain's interstate carriage unless railroads interchange their cars with it. The particular type of service introduced by Seatrain, and found by the Commission to be qualitatively superior, cannot be rendered without the privilege of carrying the very railroad cars which carry freight to its ports. The 'inherent advantages of this service' would be lost to the public without railroad car interchange.

"Furthermore, the Act calls for 'fair and impartial regulation.' The railroad Association's rule however is constructed on the premise that the railroads can at their discretion determine which water carrier may, and which may not, transport their cars. Seatrain alone, of all the water carriers, according to the Commission's findings, has been refused car interchange.

This means that the Association's rule, if valid, enables the railroads to decline to deal with Seatrain as it does with other carriers. As early as 1914, the Commission had declared that the Interstate Commerce Act, as then in effect, prohibited railroad practices which lent themselves to such purpose. The Commission said at that time:

" 'If rail carriers are permitted to choose the particular boat lines with which they will establish through routes and joint rates, they will be able to dictate who shall operate on the water and who shall not, for a boat line which is accorded a monopoly of the through rail-and-water traffic will soon be able to drive its competitors out of business.' Pacific Navigation Co. v. Southern Pacific Co., 31 I.C.C. 472, 479.

"We cannot agree with the contention that the Commission has less power now to protect water carriers than it had in 1914. The 1940 Act was intended, together with the old law, to provide a completely integrated interstate regulatory system over motor, railroad, and water carriers. In the light of its declared policy, and because of its provisions hereafter noted, we think railroads are under a duty to provide interchange of cars with water carriers to the end that interstate commerce may move without interruption or delay. Cf. Flour City S. S. Co. v. Lehigh Valley R. Co., 24 I.C.C. 179, 184." 323 U.S. at pages 617–619, 65 S.Ct. at pages 474–475.

The Court then cited sections 1(4), 3(4) and 15(3) of Part I of the Interstate Commerce Act[4] as sufficient authorization for

4. It is provided by § 1(4) of the Interstate Commerce Act, 49 U.S.C.A. § 1(4), that it shall be the duty of common carriers by railroad to establish reasonable through routes with carriers by water, and just and reasonable rates, fares, charges and applications applicable thereto. It is further provided that it shall be the duty of every common carrier establishing through routes to provide reasonable facilities for operating such routes and to make reasonable rules and regulations with respect to their operation and provide for reasonable compensation to those entitled thereto and in the case of joint rates, fares, or charges, to establish just, reasonable and equitable divisions thereof, which shall not unduly prefer or prejudice any of such participating carriers.

By § 1(10) 49 U.S.C.A. § 1(10), the term "car service" includes the use, control, supply, movement, distribution, exchange, interchange and return of loco-

the Commission's order in that case and concluded:

"It was from its power to require through routes that the Commission originally derived its power to require interchange of railroad cars among connecting railroads. Since a rail-water through route with Seatrain cannot function without an interchange of cars, the unquestioned power of the Commission to require establishment of such routes would be wholly fruitless, without the correlative power to abrogate the Association's rule which prohibits the interchange." 323 U.S. at page 619, 65 S.Ct. at page 475.

In the spirit of this interpretation of the national transportation policy it appears that the Interstate Commerce Commission has the jurisdiction and the power to direct such conditions of interchange that will integrate Seatrain into the na-

motives, cars, and other vehicles used in the transportation of property by any carrier by railroad.

By § 1(13), 49 U.S.C.A. § 1(13), the Commission is empowered to require all carriers by railroad to file with it from time to time their rules and regulations with respect to car service and the Commission may, in its discretion, direct that such rules and regulations shall be incorporated in their schedules showing rates, etc.

By § 1(14) (a), 49 U.S.C.A. § 1 (14) (a), the Commission may, after hearing on a complaint or upon its own initiative, establish reasonable rules and regulations and practices with respect to car service by common carriers by railroad including the compensation to be paid and other terms by agreement or arrangement for the use of any car or other vehicle not owned by the carrier using it (and whether or not owned by another carrier).

By § 3(4), 49 U.S.C.A. § 3(4), it is provided that all rail carriers, according to their respective powers, shall afford all reasonable and equal facilities for the interchange of traffic between their respective lines and connecting lines and shall not discriminate in their rates between connecting lines or unduly prejudice any connecting line in the distribution of traffic that is not specifically routed by the shipper. The term "connecting line" is specifically defined as including any common carrier by water.

By § 7, 49 U.S.C.A. § 7, it is provided that it shall be unlawful for any common carrier to "enter into any combination, contract, or agreement, expressed or implied, to prevent, by change of time schedule, carriage in different cars, or by other means or devices, the carriage of freights from being continuous from the place of shipment to the place of destination; and no break of bulk, stoppage, or interruption made by such common carrier shall prevent the carriage of freights from being and being treat-ed as one continuous carriage from the place of shipment to the place of destination, unless such break, stoppage, or interruption was made in good faith for some necessary purpose, and without any intent to avoid or unnecessarily interrupt such continuous carriage or to evade any of the provisions of this part."

By § 15(3), 49 U.S.C.A. § 15(3), it is provided that the Commission may, after full hearing upon complaint or upon its own initiative "establish through routes, joint classifications, and joint rates, fares, or charges, applicable to the transportation of passengers or property by carriers * * * by railroad * * * and common carriers by water subject to part III, or the maxima or minima, or maxima and minima, to be charged, and the divisions of such rates * * * and the terms and conditions under which such through routes shall be operated. * * *"

"By § 305(b), 49 U.S.C. § 905(b), it shall be the duty of common carriers by water to reciprocally establish reasonable through routes with other such carriers and with common carriers by railroad and rates and classifications applicable thereto to provide reasonable facilities for operating such through routes and to make reasonable rules and regulations with respect to their operation and providing for reasonable compensation to those entitled thereto.

There are a number of other provisions of the Interstate Commerce Act that are relevant to the relationships between carriers by rail and water carriers such as Seatrain, or that implement those above set forth. A historical analysis of the provisions of the Interstate Commerce Act and later amendments which impose specific duties as to car interchange are detailed in the case of Pennsylvania R. Co. v. United States, D.C., 55 F.Supp. 473, at pages 479–483 and summarized in footnote 5 in the Supreme Court opinion in the same case, 323 U.S. 612, at page 618, 65 S.Ct. 471, at page 474.

126

tional transportation system as envisaged by the National Transportation Act of 1940 to the maximum use of its service and facilities subject, of course, to the standard of public necessity and convenience. It may determine and direct through routes with Seatrain as it, indeed, had done heretofore and if in the proper development of those through routes interchange of and access to cars, even though not owned by railroads participating in such through routes are required, it may make appropriate directions. To this end if the suspension of Car Service Rule 4 of the Association is required, the Commission must have the power to do so.

■ Obviously the many considerations that enter into the task of determining the character of such interchange are not for the courts, but for the expert judgment of the Interstate Commerce Commission.

Therefore I find a definite distinction between this case and State of Georgia v. Pennsylvania R. Co., supra [324 U.S. 439, 65 S.Ct. 727]. In that case there is the naked combination to force the fixing of rates within a " 'zone of reasonable' " the existence of which combination the Supreme Court held was within the jurisdiction of a court to determine under the antitrust laws. In this case the inquiry concerns itself with agreements and arrangements recognized as valid by, or subject to change at the direction of, the Commission. The suggestion of Seatrain that the complicated network of them should be enjoined pending its admission to their benefits is not impressive for that would not benefit Seatrain and would prove chaotic to the industry that is the nation's very circulatory system. Rather, it must be determined whether or not they should be

pried open to admit Seatrain and under what conditions. Surely this is for the Interstate Commerce Commission to probe with all its sharp instruments of experience and expert resource. Keogh v. Chicago & N. W. Ry. Co., 1922, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183; U. S. Navigation Co. v. Cunard S. S. Co., 1932, 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408; Central Transfer Co. v. Terminal R. R. Ass'n, 1933, 288 U.S. 469, 53 S.Ct. 444, 77 L.Ed. 899; and Terminal Warehouse v. Pennsylvania R. Co., 1936, 297 U.S. 500, 56 S.Ct. 546, 80 L.Ed. 827.

■ It is true that the Interstate Commerce Commission has announced a limitation upon its power to direct the interchange and use of railroad cars to Seatrain, as in Investigation of Seatrain Lines, Inc., 206 I.C.C. 328, and that it has also made definitive rulings governing conditions under which the cars were to be used, Hoboken Manufacturers Railroad Company v. Abilene & S. Railway Company, 248 I.C.C. 109. It is likewise true that Seatrain has made no application to the Commission for a more general use of cars since the decision of the United States Supreme Court in United States v. Pennsylvania R. Co., supra, in 1945. The pronouncements of the Commission heretofore made are not so final but that in the light of the latter decision it could reexamine them under its continuing jurisdiction over its orders pursuant to the provisions of sections 16(6) and 17(6), 49 U.S.C.A. § 16(6) [5] and § 17 (6).[6]

■ Seatrain rests in no better case in its application of § 16 of the Clayton Act, 15 U.S.C.A. § 26, to its prayer for injunctive relief against the defendants. True, injunctive relief under the Clayton Act is not

5. Section 16(6). 49 U.S.C.A. § 16(6). "The commission shall be authorized to suspend or modify its orders upon such notice and in such manner as it shall deem proper."

6. Section 17(6). 49 U.S.C.A. § 17(6). "After a decision, order, or requirement shall have been made by the Commission, a division, an individual Commissioner, or a board, or after an order recommended by an individual Commissioner

or a board shall have become the order of the Commission as provided in paragraph (5), any party thereto may at any time, subject to such limitations as may be established by the Commission as hereinafter authorized, make application for rehearing, reargument, or reconsideration of the same, or of any matter determined therein. Such applications shall be governed by such general rules as the Commission may establish. * * * "

denied to private persons and confined only to the United States. But the Act specifically provides that

"* * * nothing contained in sections 12, 13, 14–21, 22–27 of this title shall be construed to entitle any person, firm, corporation, or association, except the United States, to bring suit in equity for injunctive relief against any. common carrier subject to the provisions of chapters 1 and 8 of Title 49, in respect of any matter subject to the regulation, supervision, or other jurisdiction of the Interstate Commerce Commission."

Seatrain contends that as in the decision of the Supreme Court in the case of State of Georgia v. Pennsylvania R. Co., supra, it is seeking only injunctive relief against the combination of which it complains and that this is not "in respect of any matter subject to the regulations, jurisdiction or other supervision of the Interstate Commerce Commission." Surely Seatrain cannot maintain that it merely seeks to remove a combination and conspiracy designed to influence each railroad to deny access to its cars to Seatrain without more and that its attack upon Car Service Rule 4 is only to the extent that it has been used as a means of such a combination or conspiracy. Seatrain's position must be that no railroad has the right to deny to it such access if it permits the use of its cars by railroads. I cannot agree that any distinction arises between the obstacle Seatrain faces in the proviso of section 16 of the Clayton Act and the barrier with which it is confronted by the doctrine of primary jurisdiction. Under the considerations heretofore expressed not only has the Interstate Commerce Commission jurisdiction to grant it relief from its alleged complaints but that relief cannot be afforded except as the Commission finds that it is justified and if so under what terms and conditions it is to be regulated and administered.

When the Supreme Court in State of Georgia v. Pennsylvania R. Co., supra, distinguished that case from the case of Central Transfer Co. v. Terminal Ry. Association, 1933, 288 U.S. 469, 53 S.Ct. 444, 77 L.Ed. 899 it did not aid Seatrain over the hurdle of the proviso in section 16 of the Clayton Act for Seatrain is not in the position of the State of Georgia. The Court in the Georgia case also adhered to its decision in Terminal Warehouse v. Pennsylvania R. Co., 297 U.S. 500, 56 S.Ct. 546, 80 L.Ed. 827, when it said:

"If a sufferer from the discriminatory acts of carriers by rail or by water may sue for an injunction under the Clayton Act without resort in the first instance to the regulatory commission, the unity of the system of regulation breaks down beyond repair." 297 U. S. at page 513, 56 S.Ct. at page 551.

Unlike Georgia, Seatrain is not faced with only an agreement or combination outside the jurisdiction of the Commission. In Seatrain's case the agreements which it claims offend it do so in only one way, that is, excluding it from their scope. The right to be included in those arrangements and the conditions surrounding such inclusion is a subject within "the regulation, jurisdiction or other supervision of the Commission."

Nor is the decision of this court in the case of Slick Airways, Inc., v. American Airlines, Inc., D.C., 107 F.Supp. 199, opinion on rehearing, filed August 18, 1952 inconsistent with the position assumed in this case. There the regulatory statute was the Civil Aeronautics Act under which the Civil Aeronautics Board was without power to provide remedial relief for past injuries resulting to a victim of a conspiracy. In that case the conspiratorial acts and the combination which were akin to those described in State of Georgia v. Pennsylvania R. Co., supra, were held to be within the jurisdiction of the court.

■ The subsidiary charges made by Seatrain as to unfair competitive practices upon the part of the defendants are incidental to the main allegations of the complaint that the defendants have conspired to deny to Seatrain interchange and use of freight cars owned by railroads. They must follow the major charge as being within the jurisdiction of the Commission.

■ Neither can this court maintain jurisdiction over the suit in so far as it claims

treble damages from the primary defendants under the holding herein that the complaint charges acts cognizable under the primary jurisdiction of the Commission which are remediable under its reparation power. Keogh v. Chicago & N. W. Ry., 1922, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183; Terminal Warehouse Co. v. Pennsylvania R. Co., 1936, 297 U.S. 500, 56 S.Ct. 546, 80 L.Ed. 827; State of Georgia v. Pennsylvania R. Co., 1945, 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051.

■ The heart of the controversy raised here revolves around the question of whether Seatrain shall have access to the freight cars of the railroads. A number of side issues have been introduced into the argument which are moot questions and help but little toward a solution of the problem. For instance, Pennsylvania Railroad Company, one of the primary defendants, insists that it is not a through route carrier with Seatrain although such a status was ordered for it by the Commission. This, however, was when Seatrain's Port of New York Terminal was at Hoboken. Since Seatrain substituted Edgewater for Hoboken in 1947 Pennsylvania considers itself not bound by an order designating Hoboken as a terminal but certainly the status of Pennsylvania as a through route carrier as it might have been affected by the substitution of Edgewater for Hoboken was a matter for definitive action by the Commission. Again, it is argued that in 1942 when the vessels of Seatrain were requisitioned by the War Shipping Administration the Commission itself recognized its authority to deal with the question of interchange between rail and water carriers unrestrictedly as to through routes. On May 22, 1942, the Commission issued its Service Order No. 75 in which it suspended Car Service Rule 4 in so far as it applied to the delivery of railroad cars to water carriers controlled or operated by or for the account of the War Shipping Administration. Shortly after the close of hostilities in August of 1945, the order was vacated and Rule 4 was restored. Seatrain contends that it was purely an exercise of emergency power under Section 1(15) of the Act and not evidence that the Commission had changed its

"original limited view of its authority" as urged by the defendants. Seatrain's theory of what was behind the Commission's action is probably more accurate but the speculation is fruitless in resolving the vital issue in the case. Many other such "side" issues are explored by the parties but analysis and recital of them here would add nothing to this decision.

It is indeed regrettable that Seatrain should have been exposed to such time consuming procedures in airing its problems administratively and in the courts. Concededly, they involve intricate and delicate mechanisms functioning in a highly complicated area of industry and commerce. Perhaps the circumstances attendant upon the innovation of transportation of loaded freight cars in the manner of the Seatrain system and the interruption of the war years permitted no greater progress to the solution of the problems involved.

However, it would now appear that although some of the defendant railroads have for many years resisted the efforts of Seatrain to gain access to freight cars and have gainsaid the power of the Interstate Commerce Commission to direct it, certain of them including the primary defendants in this case, and others, filed a complaint with the Commission, on March 26, 1952, entitled Alabama Great Southern Railroad Company v. Seatrain Lines, Inc., Docket No. 31014. In it they state that they seek

"* * * a complete and authoritative determination of all of the problems involving Seatrain's relationship to the national transportation system, which would establish under the Commission's supervision a stable and proper relationship.

"The complainant railroads have accordingly concluded that the time has come when there ought to be a definitive and over-all solution of these many interrelated problems. It is insufficient, for a long-term solution, merely to establish that the court has neither jurisdiction nor authority to contrive this solution, nor should the railroads continue to await the piecemeal solution of the problems by this Commission in isolated controversies. Indeed, it is in

.the public interest that there be a comprehensive examination or reexamination of all the difficult issues between Seatrain and the railroads. It is in the interest of all that these problems receive authoritative over-all solution. Both Seatrain and the railroads have an obligation, to the public and to this Commission, to obtain resolution of these many issues and thus terminate what would otherwise be an unending controversy. In recognition of that responsibility, the complainant railroads file this comprehensive complaint."

All of the railroads which have or *might have through routes* with Seatrain, *or which might own cars that might be interchanged with Seatrain*, are made formal defendants in this proceeding. There would appear to be no reason why the allegations of Seatrain, as set forth in the complaint in this suit, may not be projected before the Commission in the course of·its hearing and investigation of the above petition pending before it.

Naturally Seatrain is suspicious of this move upon the part of the railroads and objects that many of the matters proposed by the petition have already been litigated before the Commission and that the petition has been filed in the hope of gaining further delay. It is a fact that heretofore fragmentary actions have been instituted before the Commission but with the interjection by Seatrain of the issues raised in this suit the proposed action should afford a complete review of them and the prescription of such terms and practices as may be determined to be just to Seatrain, the railroads and the public.

■ In this view there appears to be no utility in holding the complaint in court and staying proceedings thereon as in General American Tank Corp. v. El Dorado Terminal Co., 1940, 308 U.S. 422, 60 S.Ct. 325, 84 L.Ed. 361; S. S. W., Inc., v. Air Transport Ass'n of America, D.C.Cir., 191 F.2d 658, and Apgar Travel Agency, Inc., v. International Air Transport Ass'n, D.C. S.D.N.Y., 107 F.Supp. 706. Rather the course here is dictated by Far Eastern Conference v. United States, 1952, 342 U.S. 570, 576–577, 72 S.Ct. 492, 495, where the Court said:

"Having concluded that initial submission to the Federal Maritime Board is required, we may either order the case retained on the District Court docket pending the Board's action, General American Tank Corp. v. El Dorado Terminal Co., 308 U.S. 422, 432–433, 60 S.Ct. 325, 331, 84 L.Ed. 361; El Dorado Oil Works v. United States, 328 U.S. 12, 17, 66 S.Ct. 843, 846, 90 L.Ed. 1053; see United States v. Interstate Commerce Commission, supra, 337 U.S. [426] at page 465, note 12, 69 S.Ct. 1430 [93 L.Ed. 1451], or order dismissal of the proceeding brought in the District Court. As distinguished from the situation presented by the first El Dorado case, supra, which was a contract action raising only incidentally a question proper for initial administrative decision, the present case involves questions within the general scope of the Maritime Board's jurisdiction. Shipping Act of 1916, §§ 14, 15, 39 Stat. 728, 733, 46 U.S.C. §§ 812, 814, 46 U.S.C.A. §§ 812, 814. An order of the Board will be subject to review by a United States Court of Appeals, with opportunity for further review·in this Court on·writ of certiorari. Pub.L. No. 901, 81st Cong., 2d Sess., §§ 2, 10, 64 Stat. 1129, 1132. If the Board's order is favorable to the United States, it can be enforced by process of the District Court on the Attorney General's application. 39 Stat. 728, 737, 46 U.S.C. § 828, 46 U.S.C.A. § 828. We believe that no purpose will here be served to hold the present action in abeyance in the District Court while the proceeding before the Board and subsequent judicial review or enforcement of its order are being pursued. A similar suit is easily initiated later, if appropriate. Business-like procedure counsels that the Government's complaint should now be dismissed, as· was the complaint in United States Navigation Co. v. Cunard Steamship Co., supra."

Therefore plaintiff's motion for a preliminary injunction is denied and defendants' motions to dismiss the complaint are granted.

An order in conformity herewith should be settled.